**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**March 22, 2006**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 01-50010

_____

BILLIE WAYNE COBLE,

Petitioner-Appellant,

versus

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

Respondent-Appellee.

Appeal from the United States District Court
For the Western District of Texas

Before JOLLY, GARZA, and STEWART, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The opinion of the court issued on July 18, 2005 and reported at 417 F.3d 508 is withdrawn, and the following is substituted.

Petitioner, Billie Wayne Coble ("Coble"), was convicted of capital murder in the state court of Texas and sentenced to death. Based on a Certificate of Appealability ("COA") on two issues, one granted by the district court and one by this court, Coble appeals the district court's denial of federal habeas relief. We AFFIRM the district court's judgment.

I

Coble was convicted of the capital murders of his brother-in-law, father-in-law, and mother-in-law. The facts of Coble's crimes are set forth in the opinion of the Texas Court of Criminal Appeals ("TCCA") disposing of Coble's direct appeal.

Coble was having marital problems and separated from his wife, Karen Vicha, not long before the murders. Coble kidnaped Karen Vicha at knife-point. He attempted to convince her not to divorce him, but eventually released her unharmed. *Coble v. State*, 871 S.W.2d 192, 195-96 (Tex. Crim. App. 1993) (en banc). Several weeks later, Coble was seen driving around the area where Karen Vicha and her parents lived. *Id*. at 196. That afternoon, he was waiting at his wife's house when her daughters returned from school. Coble handcuffed and tied up her three children and one of their cousins. *Id*. Next, Coble cut the phone lines to the house and went down the street to the house of his brother-in-law, Bobby Vicha. Coble and Bobby Vicha struggled, and Coble ultimately shot Bobby Vicha in the neck. *Id.* at 196-97 & n.6. He returned to Karen Vicha's house for a period of time and then went across the street to the Vicha family home. Coble fatally shot Karen Vicha's parents, Zelda Vicha and Robert Vicha. He cut the phone lines to the Vicha family home as well. *Id.* at 196-97.

When Karen Vicha arrived home from work, Coble was waiting for her. *Id*. at 197. He admitted to killing her parents and brother and told her that Bobby Vicha had shot him. He then handcuffed her and drove her out to a rural area in her car. Karen Vicha later testified that Coble assaulted her during the drive. Coble was eventually apprehended after a brief high-speed pursuit, which ended when Coble crashed into a parked car. At the hospital where Coble and Karen Vicha were taken for treatment, Coble spontaneously told various hospital personnel and police officers that

he had killed three people. *Id.*

Coble was subsequently convicted of capital murder. At the close of the penalty phase evidence, the jury answered the special issues in the affirmative and the judge sentenced Coble to death. His direct appeal was affirmed by the TCCA, and the Supreme Court denied his petition for a writ of certiorari. *Id.* at 208, *cert. denied*, *Coble v. Texas*, 513 U.S. 829 (1994).

Coble filed an application for a state writ of habeas corpus, alleging twenty-six claims for relief. The trial court held an evidentiary hearing on five of these claims, but recommended that relief be denied. The TCCA agreed, adopted the trial court's findings of fact and conclusions of law, and denied relief in an unpublished order. *Ex parte Coble*, No. 39,707-01 (Tex. Crim. App. 1999).

Coble then applied for federal habeas relief, and the district court appointed counsel. Coble filed his habeas petition, alleging twenty-five claims, and the district court stayed his execution pending resolution of the petition. The district court denied Coble's request for an evidentiary hearing and denied the writ. The district court did, however, grant COA on the issue of ineffective assistance of counsel. Coble then petitioned for COA from this court on eleven additional grounds. We granted COA on the issue of whether the "special issue" interrogatories in the Texas capital sentencing instruction precluded effective consideration of Coble's mitigating evidence in violation of the mandates of *Penry v. Lynaugh*, 492 U.S. 302 (1989) ("*Penry I*"), and *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*"). *Coble v. Cockrell*, 80 Fed. Appx. 301 (5th Cir. 2003).

II

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and review its conclusions of law de novo, applying the same standard of review to the state court's decision as the district court." *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998). Because Coble

filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the district court's federal habeas review was governed by AEDPA.

Under AEDPA, habeas relief is not available to a state prisoner

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ) )
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court" if: (1) "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 406 (2000). A state court decision is an unreasonable application of clearly established Supreme Court precedent if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id*. at 407-08. The inquiry into unreasonableness is objective. *Id*. at 409-10. A state court's incorrect application of clearly established Supreme Court precedent is not enough to warrant federal habeas relief; in addition, such an application must also be unreasonable. *Id*. at 410-12. The state court's factual findings are presumed to be correct, and the habeas petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

III

Coble makes multiple ineffective assistance of counsel arguments. These claims are governed by the familiar standards of *Strickland v. Washington*, 466 U.S. 668 (1984). Coble must establish: (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) that the deficient representation caused prejudice, which requires a showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams*, 529 U.S. at 390-91 (quoting *Strickland*, 466 U.S. at 688, 694). Our scrutiny of counsel's performance is "highly deferential" and there is a "strong presumption" that any alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Coble claims trial counsel did not adequately prepare for the sentencing phase of trial because they failed to interview and prepare the witnesses who testified at trial. In the cases cited by Coble, trial counsel failed to conduct *any* investigation of witnesses who might have provided alibis or who were eyewitnesses. *See, e.g.*, *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994) ("[Counsel's] complete failure to investigate alibi witnesses fell below the standard of a reasonably competent attorney practicing under prevailing professional norms."). *See also Rompilla v. Beard*, 125 S.Ct. 2456 (2005) (counsel provided ineffective assistance by failing to examine a file on defendant's prior convictions at sentencing phase of capital murder trial despite knowing the state's strategy was to emphasize defendant's violent character). In this case, Coble concedes that trial counsel's professional investigator interviewed all of the witnesses prior to their testimony. Furthermore, even assuming counsel failed to fully prepare these witnesses, Coble only argues that these witnesses would have been "more effective" if they had been better prepared, which does not come close to suggesting that "but for counsel's errors, the result of the proceeding would have been different." Coble also

alleges that trial counsel failed to call favorable witnesses to testify. "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)). Coble has not established what information these witnesses would have provided. Based on what can be gleaned from his briefs, these witnesses would have presented testimony already provided by other witnesses.[1] Counsel's decision not to present cumulative testimony does not constitute ineffective assistance. *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984). Finally, Coble alleges that counsel was ineffective because they only conducted two interviews of him while he was awaiting trial in prison. There is no support for this assertion in the record. Sheila Thun, a deputy of the Sheriff's office who worked in the jail and was responsible for keeping jail records, testified that attorney visitations are not recorded in the same manner as lay visitations. Attorneys were simply required to sign a card that was subsequently destroyed. Coble's trial counsel, Hoagie Karels, also testified that it was not unusual for him to see a client in jail without signing in and that jail visitation records indicating no visits to Coble would be inaccurate. Karels testified that jail-based meetings with Coble occurred whenever necessary and that meetings were also conducted in the courtroom. Based on the information before the state habeas court, its denial of habeas relief was not objectively unreasonable.

Coble also argues that trial counsel failed to present a coherent theory regarding mitigation

---

[1] Coble argues that these uncalled witnesses would have testified regarding Coble's difficult upbringing, his mother's psychiatric problems, his stay in a state home, his Vietnam experiences, and his positive performance as a father and worker. Coble's sentencing witnesses testified about these issues.

evidence in order to persuade the jury to answer "no" to the second special issue question.[2] Coble argues that counsel's closing argument was ineffective, counsel ineffectively cross-examined the State's expert on the point of future dangerousness, and counsel should have presented a statistical theory related to whether Coble, as an older man with an extended prison term, represented a continuing threat. Many of the factors that make up this "coherent theory" were presented at trial. For example, counsel presented experts who testified that Coble's actions were impulsive, that he suffered from psychiatric problems, and that he would likely not be a repeat offender. In addition, witnesses testified that Coble had a difficult childhood, tragic experiences in Vietnam, but was a devoted father, a diligent worker, and that he contributed to his community. Indeed, counsel presented a coherent theory to support a life sentence: Coble committed a crime of passion, one which he likely would not repeat. At its base, Coble's current challenge is to the strategy employed by trial counsel. Such a challenge does not establish ineffective assistance. *See Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) ("[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. . . . Judicial review of a defense attorney's summation is therefore highly deferential)) and doubly deferential when it is conducted through the lens of federal habeas."). Coble's indictment of trial counsel's cross-examination of the State's expert is equally meritless. Coble presented experts who testified that Coble would not be a threat and he challenged the State's expert on recidivism of "passion killers."

_____

[2] In order to sentence a convicted defendant to the death penalty, Texas law requires juries to affirmatively answer two special issues. In this case, the second special issue given at Coble's sentencing was "Is there a reasonable probability that the Defendant, Billie Wayne Coble, will commit criminal acts of violence that would constitute a continuing threat to society?"

Coble's desire to have a specific defense theory presented does not amount to ineffective assistance on federal habeas review. *Johnson v. Cockrell*, 301 F.3d 234, 239 (5th Cir. 2002) (quoting *Strickland*, 466 U.S. at 689) ("[C]ourts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"). We cannot say that the state habeas court's decision was objectively unreasonable.

Coble contends next that trial counsel rendered ineffective assistance during the guilt/innocence phase of the trial by failing to construct a viable insanity or diminished capacity defense. Coble argues that evidence of his mental state, which was extensively developed at sentencing, should have instead been presented at the guilt/innocence phase of trial. In this case, the trial court denied a defense request for an insanity instruction. Trial counsel testified before the state habeas court that the possibility of an insanity defense was investigated. Trial counsel also testified that no expert would support the insanity defense. Coble offered no evidence to the state habeas court that he was insane at the time of the murders. Trial counsel investigated the possibility of presenting an insanity defense and opted to hold the evidence until the sentencing phase of trial. Thus, counsel was not ineffective for failing to present an insanity defense at the guilt/innocent phase of trial since no experts would support the defense. *See Wheat v. Johnson*, 238 F.3d 357, 363 (5th Cir. 2001); *Crane v. Johnson*, 178 F.3d 309, 313-14 (5th Cir. 1999); *Williams v. Cain*, 125 F.3d 269, 278-79 (5th Cir. 1997) ("failure to present . . . evidence would not constitute 'deficient' performance within the meaning of *Strickland* if . . . [counsel] could have concluded, for tactical reasons, that attempting to present such evidence would be unwise."). In addition, counsel was not ineffective for failing to present a diminished capacity defense because diminished capacity is not cognizable in Texas. *See, e.g.*, *Jackson v. State*, 115 S.W.3d 326, 328 (Tex. App. )) Dallas 2003). We cannot

say that the state habeas court's decision was objectively unreasonable.

Coble also asserts that trial counsel provided ineffective assistance for failing to object to the prosecutor's improper comments during closing arguments. The prosecutor described Coble as "a cold-blooded, merciless, remorseless killer" and Coble argues that "remorseless" refers to Coble's failure to testify at trial. However, the prosecutor never referenced Coble's failure to testify and there was evidence presented at trial that, immediately following the murders, Coble made comments that indicated his lack of remorse. Without some indication that the prosecutor was referring to Coble's failure to testify, rather than Coble's comments indicating a lack of remorse, this argument is meritless. *See Rivera v. Collins*, 934 F.2d 658, 661 (5th Cir. 1991) ("A statement by a district attorney is not manifestly intended to comment on the defendant's silence when there is another plausible explanation."). We cannot say that the state habeas court's decision was objectively unreasonable.

Coble contends next that he received ineffective assistance of counsel because his trial counsel allowed a defense expert, Dr. Stephen Mark, to testify that Coble would likely be a danger in the future unless he was medicated. Dr. Mark, a psychiatrist, testifed at trial that he examined Coble on more than one occasion and found that he was a violent and suicidal person due to the depression caused by his post-traumatic stress disorder and bipolar disorder. In his testimony, Dr. Mark stated that Coble's psychiatric disorders and his unique history of separation from his mother and previous wives caused a total loss of control. Dr. Mark did admit that timely hospitalization and treatment with mood-stabilizing drugs could have prevented the murders and that Coble's psychiatric disorders could be controlled by medication. Coble points to evidence presented to the state habeas court that indicated his attorneys and expert disagreed over whether the expert informed the attorneys prior to

trial regarding his opinion of Coble's future dangerousness. According to the affidavits of Coble's counsel, Ken Ables and Hoagie Karels, they believed that Dr. Mark would testify at trial that Coble would not be a future danger. Ables and Karels acknowledged that they were surprised by Dr. Mark's trial testimony and that the defense would not have called him as a witness had they known what Dr. Mark's testimony would be on the stand. Coble points to Dr. Mark's affidavit in the state habeas hearing that asserts he discussed the case with Ables on at least six occasions. Dr. Mark remarked that the attorneys should not have been surprised by his testimony that Coble might be a future danger if left untreated, therefore making his testimony more favorable to the prosecution. Coble argues that the presentation of this unfavorable expert testimony negated the effectiveness of his defense. The state habeas court concluded that "at most there was a mis-communication concerning the content of [Dr. Mark's] testimony, or a mis-comprehension of the substance of his testimony as it pertained to the issue of future dangerousness and mitigation." The state habeas court was thus presented with two conflicting stories regarding the communication between Coble's counsel and Dr. Mark. The court believed Coble's counsel that they expected Dr. Mark to testify favorably for their client, not that they submitted the expert despite being aware of the damaging nature of his testimony. Therefore, the state habeas court concluded that counsel's performance was not ineffective. While the wisdom of trial counsel's decision to submit the expert is debatable, the state court's denial of habeas relief was not unreasonable. *See Emery v. Johnson*, 139 F.3d 191, 197 (5th Cir. 1997) ("The Sixth Amendment does not guarantee criminal defendants the right to error-free representation.").

Furthermore, even assuming that trial counsel's performance fell below an objective standard of reasonableness, Coble does not establish that the result of the proceedings would have been

different, as the habeas court also found that there was no prejudice. First, Dr. Mark's expert testimony was not that Coble was absolutely a future danger, but rather that, left untreated, he was a future danger. Second, other evidence suggested that Coble would be a future danger, including the State's expert who testified that Coble constituted a future danger, the horrific nature of the murders, and testimony that Coble was aggressive and violent towards women in the years before the murders. *See Little v. Johnson*, 162 F.3d 855, 860-61 (5th Cir. 1998) ("Deficient performance is prejudicial only upon a showing that but for counsel's errors, there is a reasonable probability that the ultimate result would have been different and that confidence in the reliability of the verdict is undermined."). Accordingly, we find the state habeas court's decision objectively reasonable.

Coble also argues trial counsel was ineffective for admitting into evidence psychiatric reports at the penalty phase which suggested he was a future danger.[3] Coble asserts that trial counsel could have prevented any State attempt to introduce these exhibits because they violated the Confrontation Clause of the Sixth Amendment. However, each of the exhibits that trial counsel introduced satisfied an exception to the hearsay rule,[4] and thus met the requirements of the Confrontation Clause. *See Lilly v. Virginia*, 527 U.S. 116, 124-25 (1999) (hearsay evidence does not offend the Confrontation Clause where the evidence falls within a firmly rooted hearsay exception); *White v. Illinois*, 502 U.S. 346, 356 (1992). Although the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 68-69

---

[3] The four exhibits included: (1) a psychiatric report on Coble prepared by Dr. Ralph Hodges, dated May 6, 1964, when Coble was 15 years old; (2) a Veteran's Administration report of a medical examination on Coble by a neuropsychiatrist performed in 1970; (3) a Veteran's Administration rating decision relating to Coble dated February 20, 1970; and (4) a clinical narrative relating to Coble dated Novermber 22, 1967.

[4] *See* TEX. R. EVID. 803(4) (statements made for purposes of medical diagnosis or treatment); TEX. R. EVID. 803(6) (records of regularly conducted activity); and TEX. R. EVID. 803(16) (authenticated documents over 20 years old).

(2004), held that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is . . . confrontation," none of the exhibits submitted during the penalty phase of trial that Coble contests were *testimonial* statements, as discussed in *Crawford*. 541 U.S. at 51-53. Trial counsel's decision to admit these damaging documents before the State was able to introduce them, and soften their potential damage, is a reasonable trial strategy and will not be second guessed. *See Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993) ("Given the almost infinite variety of possible trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate strategic choices."). Therefore the state habeas court's finding regarding this claim was objectively reasonable.

Coble asserts next that trial counsel was ineffective for admitting a 1964 psychiatric report from a doctor's consultation with Coble when he resided at a state home at the age of fifteen. In the report, Coble admitted to several illegal actions. These extraneous offenses were then presented to the jury when the report was introduced as evidence by trial counsel. Coble contends that the state report violated his Fifth Amendment right to self-incrimination at the time it was taken and that the admission of the report at the penalty phase of his capital murder trial violated his Fifth and Sixth Amendment rights, as articulated in *Estelle v. Smith*, 451 U.S. 454, 462-63 (1981). The Supreme Court held in *Estelle v. Smith* that the state's use, during the penalty phase of a capital trial, of the testimony of a psychiatrist who performed a court-ordered competency examination on the defendant, violated the defendant's Fifth Amendment right since the defendant was not warned that the statements could be used during the penalty phase. We considered and rejected these underlying claims in Coble's COA application. We found the district court's analysis persuasive, as well as finding that any *Estelle v. Smith* violation was harmless. *Coble v. Cockrell*, 80 Fed.Appx 301, 312

-12-

(5th Cir. 2003). In addition, Coble's claim that the report violated his Fifth Amendment rights in 1964 is meritless because the psychiatric consultation was not a custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436 (1966) (conditioning the admissibility at trial of any custodial confession on warning a suspect of his rights). Coble's statements were simply for the purpose of medical and psychiatric diagnosis. Unlike the defendant in *Estelle v. Smith*, Coble was not "faced with a phase of the adversary system," but was "in the presence of [a] perso[n] acting solely in his interest." *Estelle*, 451 U.S. 467-69. Therefore, the report did not violate his Fifth Amendment right. In addition, our precedent holds that "[i]f a defendant requests an examination on the issue of future dangerousness or presents psychiatric evidence at trial, the defendant may be deemed to have waived the fifth amendment privilege." *Vanderbilt v. Collins*, 994 F.2d 189, 196 (5th Cir. 1993). In this case, Coble's trial counsel made a strategic decision to admit the 1964 report, before the prosecution, to soften the blow in the minds of the jury. Coble does not establish that the state habeas court's resolution of these claims was objectively unreasonable.

Coble claims that cumulative error merits habeas relief. Federal habeas relief is only available for cumulative errors that are of a constitutional dimension. *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997); *Yohey*, 985 F.2d at 229. As previously discussed, none of Coble's ineffective assistance claims establish ineffective assistance under *Strickland*. Coble has not identified errors of constitutional dimension. Accordingly, we cannot say that the state habeas court's rejection of Coble's cumulative error claim was objectively unreasonable.

Coble argues that the facts in his case are indistinguishable from the facts in *Williams v. Taylor*, 529 U.S. 362 (2000), which held that petitioner was denied effective assistance of counsel when his attorneys failed to investigate and present substantial mitigating evidence during the

sentencing phase of his capital murder trial. However, there are clear differences between the performance of Coble's counsel at trial and the performance of Williams' counsel. In *Williams*, counsel only prepared for the guilt phase a week before trial, failed to investigate mitigating evidence, failed to introduce evidence that Williams was "borderline mentally retarded," failed to investigate positive evidence regarding Williams' trustworthiness, and failed to contact a favorable witness. *Id*. at 396. The mitigation evidence that Williams' counsel presented was weak, consisting only of the testimony of three relatives who stated that Williams was "a nice boy," and the tape recorded statement of a psychiatrist. *Id*. at 369. Coble's counsel produced a significant number of witnesses who testified regarding his background. These witnesses testified regarding Coble's mother's psychiatric disorders, his time in a state home, his experience in Vietnam, his marriage difficulties, and positive factors related to his work and his children. Counsel also presented two psychiatric expert witnesses who discussed Coble's mental history. Coble concedes there was some investigation of his background, but argues there should have been more. Coble offers no explanation of what mitigating evidence further investigation might have revealed. Coble asserts that his trial counsel failed to call witnesses, but he does not explain what these witnesses would have offered distinct from the mitigation evidence that was presented. Coble's case is easily distinguishable from Williams' where trial counsel failed to uncover and present evidence relating to Williams' "nightmarish childhood" and that he was "borderline mentally retarded." *Williams*, 529 U.S. at 395-96. The state habeas decision was not contrary to or an unreasonable application of *Williams*.

Similarly, Coble contends that the state court's denial of habeas relief was contrary to clearly established federal law because the set of facts in Coble's case is materially indistinguishable from those in *Wiggins v. Smith*, 539 U.S. 510 (2003), where the Court determined that counsel was

ineffective in not investigating petitioner's life history for mitigating evidence beyond the presentence investigation report and the department of social services records.[5] Despite Coble's protests to the contrary, the facts in *Wiggins* are clearly distinguishable from the facts in the instant case. The *Wiggins* Court stressed that "[d]uring the proceedings themselves . . . counsel introduced no evidence of Wiggins' life history." 539 U.S. at 515. The failure to present this evidence was compounded by the fact that Wiggins' counsel failed to investigate Wiggins' background and never attempted to compile his social history. *Id*. at 523 ("[W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*.") (emphasis in original). Unlike in *Wiggins*, Coble's attorneys not only investigated his background, they also offered a mitigation case. In *Wiggins*, the Supreme Court found ineffective assistance of counsel because it was unreasonable to make the decision not to investigate. Here, there is no question that Coble's attorneys investigated his background. At most, Coble is challenging the strategy employed by trial counsel, arguing that witnesses should have been better prepared and that more witnesses should have been proffered. Coble's challenge is measurably distinct from the failure to investigate social history in *Wiggins*.[6]

In sum, Coble's attempts to analogize *Williams* and *Wiggins* fail because counsel is not

---

[5] Coble did not set forth his *Wiggins* argument until his reply brief. However, it is understandable that Coble did not address *Wiggins* in earlier briefing before us or the district court because the Supreme Court had not yet issued the opinion. *Wiggins* properly applies to the state court's resolution of Coble's ineffective assistance claims because that decision was not "new law," but rather an application of *Strickland*. *See Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003).

[6] In addition, Wiggins' unresearched background was appalling. Wiggins' background involved "physical torment, sexual molestation, [ ] repeated rape[,]" a period of homelessness, and diminished mental capacities. *Wiggins*, 539 U.S. at 535. Coble is unable to describe any mitigation evidence that was available, but not investigated.

required to "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533.

We also recognize the Supreme Court's recent decision in *Rompilla v. Beard*, in which the Court held "that even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." 125 S.Ct. 2456, 2460 (2005). Counsel for Rompilla knew the prosecution's sentencing strategy))emphasizing his violent character by introducing past felony convictions involving the use or threat of violence))yet, counsel failed to make reasonable efforts to obtain mitigation evidence, or even examine the file on Rompilla's prior convictions. As discussed *supra*, Coble fails to demonstrate what additional mitigating evidence further investigation by his counsel might have revealed. The Court even distinguished the type of argument presented by Coble from that made by Rompilla, stating that "[q]uestioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt that there is any needle there. But looking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell defense counsel something about what the prosecution can produce." *Id*. at 2467. Coble simply argues that his counsel should have called additional witnesses that would have testified regarding the same issues already discussed by other witnesses. The efforts of Coble's counsel are easily distinguishable from counsel's performance in *Rompilla.*

IV

Coble argues that the jury instructions, specifically the Texas "special issue" interrogatories,

submitted during the punishment phase of his capital murder trial, deprived the jury of an effective vehicle to consider mitigating evidence in violation of the mandate in *Penry I* and *Penry II*, thus violating the Sixth, Eighth, and Fourteenth Amendments. Under the version of the Texas statute in force when Coble was tried, to impose a capital sentence, the jury had to answer two questions in the affirmative. The first special issue interrogatory addressed whether the defendant had acted "deliberately and with the reasonable expectation that the death of the deceaseds or another would result." The second special issue question instructed the jury to consider "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."[7]

Coble's trial was held between the Supreme Court's decisions in *Penry I* and *Penry II*. In *Penry I*, the Court held that the first two "special issue" interrogatories in the Texas capital sentencing instructions, though facially valid, failed to satisfy the constitutional requirement that a capital defendant be able to present and have the jury fairly consider mitigating evidence in certain situations. 492 U.S. at 315, 328. After *Penry I*, Texas trial courts still gave the special issue interrogatories to the jury, but added a supplemental instruction to "cure" any possible *Penry* defect. Eventually, the Texas legislature adjusted the special issues to add a mitigating evidence question. *See Robertson v. Cockrell*, 325 F.3d 243, 248-49 & n.4 (5th Cir. 2003) (en banc) (describing the background of the period between *Penry I* and *Penry II* and detailing the new special issue). Coble's jury, however, received the interim supplemental instruction, as did Penry's jury when his case was

_____

[7] The special issues are set out in TEX. CRIM. PROC. CODE art. 37.071. The third special issue, which is not relevant to the *Penry I*/*Penry II* analysis, addresses whether the defendant's conduct was a reasonable response to the provocation, if any, of the victim. TEX. CRIM. PROC. CODE art. 37.071(b)(1)-(3) (Vernon 1981). The third special issue was not submitted to the jury despite the objections of Coble's trial counsel.

-17-

retried.

Penry was retried and again found guilty of capital murder and sentenced to death. In *Penry II*, the Supreme Court considered a constitutional challenge from Penry on whether the jury instructions at Penry's resentencing complied with its mandate in *Penry I*. The Court considered the supplemental instruction given at Penry's subsequent retrial,[8] and held that the instruction provided "an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence." *Penry II*, 532 U.S. at 800. Specifically, the Court held that the supplemental instruction potentially created an unacceptable dilemma for the jurors because it instructed the jurors to change one of their truthful "yes" special issue answers to a "no" if they felt the defendant did not deserve the death penalty. Thus, the instructions left the jurors with the choice of either not giving effect to Penry's proffered mitigation evidence or, alternatively, violating their oath as jurors to render a true

---

[8] In its opinion, the Court restated the instruction:

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues.

*Penry II*, 532 U.S. at 789-90.

-18-

verdict.[9] *Id.* at 798-801. Coble received a virtually identical supplemental instruction at his trial as that given at Penry's trial.[10]

"The Supreme Court's rulings in *Penry II* and *Smith* should not be read to disturb its earlier holdings affirming the constitutionality of Texas' statutory death penalty sentencing scheme." *Bigby v. Dretke*, 402 F.3d 551, 570 (5th Cir. 2005) (citing *Jurek v. Texas*, 428 U.S. 262 (1976); *Franklin v. Lynaugh*, 487 U.S. 164 (1988); *Graham v. Collins*, 506 U.S. 461 (1993); *Johnson v. Texas*, 509 U.S. 350 (1993); *In re Kunkle*, 398 F.3d 683 (5th Cir. 2005)). Therefore, in order to grant relief on a *Penry* claim, "we must determine (1) whether the mitigating evidence has met the 'low threshold for relevance' and, if so, (2) that the evidence was beyond the scope of the jury" in answering the

---

[9] The Supreme Court again held in *Smith v. Texas*, 125 S. Ct. 400 (2004), that substantially similar jury instructions as those provided in *Penry II* were constitutionally inadequate.

[10] The State concedes this fact. In its entirety, the supplemental instruction given at Coble's trial, reads as follows:

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider the mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the Defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, and thereafter give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence rather than a death sentence is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one or more of the special issues under consideration.

special issues.[11]   *Bigby*, 402 F.3d at 564-65 (quoting *Tennard v. Dretke*, 124 S. Ct. 2562, 2570 (2004) (internal quotations omitted); *Madden v. Collins*, 18 F.3d 304, 308 (5th Cir. 1994)).

A

First, the Supreme Court recently held that "a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death   . . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Tennard*,  124 S. Ct. at 2570 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)).   The Court defined relevant mitigating evidence as "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value."  *Id.* (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990) (relevant mitigating evidence defined in the most expansive terms)).   Furthermore, the Court added that "a State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find it warrants a sentence less than death.'" *Id.* (quoting *McKoy*, 494 U.S. at 440).

During the sentencing phase of trial, Coble offered a variety of mitigating evidence.  First, he presented non-psychiatric mitigating evidence, including evidence of his troubled childhood; that his father died before he was born; that his mother suffered a nervous breakdown when he was eleven; and that he was sent to live at a state facility.  Coble lived at the orphanage until he was seventeen,

_____

[11] Coble's *Penry* claim must be considered in light of the recent Supreme Court decisions in *Tennard* and *Smith  v. Texas*, 125 S. Ct. 400 (2004) that significantly altered our circuit's analysis of mitigating evidence offered by a defendant in a capital case.  Before *Tennard* and *Smith*, *Penry*-type mitigating evidence was determined by the stringent test articulated in *Graham v. Collins*, 950 F.2d 1009, 1029 (5th Cir. 1992) (en banc), *aff'd*, 506 U.S. 461 (1993), and readopted in *Robertson v. Cockrell*, 325 F.3d at 251.  To qualify, mitigating evidence had to be "due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own." *Robertson*, 325 F.3d at 251 (quoting *Graham*, 950 F.2d at 1029).  In addition, the criminal acts of the defendant had to be attributable to the severe permanent condition.  *Id*. at 252.

-20-

at which point he joined the Marines and served in Vietnam.  During his four years of service, Coble served as a machine gunner and was involved in combat. Upon his return to the United States, Coble was hospitalized due to the trauma he experienced during the war.  Likewise, Coble's sister testified that he was different after he returned from Vietnam.  Coble offered testimony that he was involved with various youth programs over the years, that he had a good relationship with his son, and that he got along well with co-workers.  Coble also served as a section leader in the U.S. Army reserves and he offered evidence that he was well respected.

Coble also presented the testimony of two psychiatrists.  The first, Dr. Mark, testified that Coble was dangerous and might continue to be a danger.  In fact, Dr. Mark testified that everything in Coble's history would make him a continuing threat.  Dr. Mark also testified that Coble suffered from two psychiatric disorders: post-traumatic stress disorder, brought about by his Vietnam experiences, and a bipolar disorder.  He stated that Coble was prone to become "[p]otentially explosive and potentially aggressive and assaultive," and suggested that the bipolar disorder might be hereditary.  Dr. Mark also indicated that these illnesses made Coble susceptible to severe mood swings, which resulted in a loss of control on the day of the murders.[12]

Dr. Mark did, however, indicate that Coble would be less likely to be violent if he took medication.  In fact, Dr. Mark indicated that, had he known before the murders of Coble's past and the depression Coble was experiencing because of the pending divorce and kidnaping charges, he

---

[12] Coble does not contend that his mental illness exempts him from the death penalty under either *Ford v. Wainwright*, 477 U.S. 399 (1986) (holding that Eighth Amendment prohibits executing the insane), or *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that Eighth Amendment prohibits executing the mentally retarded). *Cf. In re Neville*, 06-10153, – F.3d –, 2006 WL 291186 (5th Cir. Feb. 8, 2006) (holding that the Eighth Amendment does not prohibit executing those who are "mentally ill" but not insane under *Ford*).

would have recommended hospitalization for further treatment and evaluation. Dr. Mark also conceded that if Coble refused to take medication he would probably be violent in the future.

Dr. James Grigson, the second defense expert, testified that Coble was suffering from severe depression at the time of the murders, and that it was very improbable that Coble would commit this type of offense again. Specifically, Dr. Grigson stated that Coble was more horrified by the pictures of the victims than anyone, and that Coble had feelings of remorse and guilt. Both psychiatrists agreed that Coble linked the loss of his wives with the loss of his mother, such that the divorces triggered severe bouts of suicidal depression. Dr. Grigson also discussed a 1964 psychiatric report, created by Dr. Ralph Hodges, which classified the fifteen year old Coble as having a "sociopathic personality disturbance of the dissocial type." Dr. Grigson stated that the term "sociopath" did not mean the same thing in 1964 as it does now, and that a diagnosis of an individual as a sociopath could not be made until a person was eighteen years old.[13] He concluded that Coble "was not a sociopath then, and not a sociopath now."[14]

Applying the low threshold articulated in *Tennard,* it seems clear that the evidence submitted by Coble constitutes relevant mitigating evidence, therefore satisfying the first prong in determining if habeas relief is proper on his *Penry* claim. The Supreme Court noted in *Tennard* that "good-character evidence . . . 'may not be excluded from the sentencer's consideration.'" 124 S. Ct. at 2570 (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)). All of Coble's evidence is mitigating in

[13] Dr. Hodges did not define the term "sociopath" nor did Dr. Grigson explain in his testimony the difference between the current meaning of the term compared to its meaning in 1964.

[14] To rebut the psychiatric testimony, the State presented Dr. Richard Coons who testified that, based on Coble's history of emotional instability and violence, there was a probability that he would continue to be dangerous in the future. In making this determination, Coons relied heavily on the 1964 report.

the sense that it might serve as a basis for a sentence less than death. *See Tennard*, 124 S. Ct. at 2570. Relevant mitigating evidence does not have to be linked to his conduct, but only show that it could lead a jury to find that a sentence other than death is warranted. *Id*. at 2570-71.

B

"Once this low threshold for relevance is met, the Eighth Amendment requires that the jury be able to consider and give effect to [Coble's] mitigating evidence." *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 3770-78 (1998)) (internal quotations omitted). In *Jurek*, the Supreme Court expressly upheld the constitutionality of the manner in which mitigating evidence is considered under the "special issues" submitted to juries in Texas capital cases. 428 U.S. at 276. The Court reasoned that the constitutionality of Texas' death penalty statute "turns on whether the enumerated questions allow consideration of particularized mitigating factors." *Id*. at 272. Since *Jurek*, the Supreme Court has consistently upheld the constitutionality of the Texas special issues if the jury can consider and give effect to the mitigating evidence at issue. *See Graham v. Collins*, 506 U.S. 461, 474 (1993). Therefore, we must determine whether Coble's mitigating evidence was beyond the scope of the jury in answering the two special issue interrogatories.

1

The second special issue, as discussed *supra*, instructed the jury to consider "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The requirements of the Eighth Amendment are satisfied "even if evidence is aggravating, as long as the mitigating aspect is within the effective reach of the jury." *Davis v. Scott*, 51 F.3d 457, 464 (5th Cir. 1995). As the Supreme Court noted in *Johnson v. Texas*, 509 U.S. 350, 369-70 (1993), the *only* way Penry's mitigating evidence of impaired mental condition

-23-

could be considered under the special issues was as an aggravating factor for future dangerousness.

This Circuit has previously held that mitigating evidence of mental illness could be considered within the context of the second special issue, future dangerousness, if the illness can be controlled or go into remission. *See, e.g.*, *Lucas v. Johnson*, 132 F.3d 1069, 1082-83 (5th Cir. 1998); *Robison v. Johnson*, 151 F.3d 256, 266 (5th Cir. 1998). In *Lucas* this court distinguished *Penry I*, stating that "the testimony at trial indicated that, although Lucas had mental problems, he responded well to antipsychotic drugs like Thorazine and that his particular illness could be treated in a controlled environment. This prospect of medical treatment placed the evidence of his mental illness and abusive childhood within 'the effective reach of the sentencer'" because "the jury could have considered whether, in an institutional setting, the probability that Lucas posed as a future danger to society was not so great as to merit imposition of the death sentence." *Lucas*, 132 F.3d at 1082-83. Similarly, this court held that Robison's mental illness was within the scope of the future dangerousness special issue since "both Robison's expert and the state's expert testified that schizophrenia is treatable, and Robison's expert testified that he was currently in a state of remission, which he attributed to being a result of the structure of prison life." *Robison*, 151 F.3d at 266.

As in *Lucas* and *Robison*, Coble's mitigating evidence demonstrated that his mental illness was treatable, thus placing it within the effective reach of the sentencer. Dr. Mark testified that, if properly treated, Coble would be less likely to commit criminal acts constituting a continuing threat to society. He also stated that medications were available to treat bipolar disorder that "help to stabilize the mood on an even keel and chemically keep the person from getting the high moods or the real low moods" as well as recently developed antidepressants that would "help block the symptoms from coming out." He testified that medical treatment would probably control Coble's

mental illness and that "there would be less likelihood of any criminal acts if he were adequately treated for both of the disorders." Dr. Grigson also testified, although Coble suffered "severe depression due to his wife divorcing him," that he "does not represent a continuing threat to society and will not be involved in future acts of violence" because his crime was a "passion type thing." The jury could have considered whether, in an institutional setting, the probability that Coble posed a future danger to society was not so great as to merit imposition of the death sentence. Therefore, we conclude that the special issues provided the jury an effective vehicle with which to consider Coble's mitigating evidence of his mental illnesses.

Coble's case can be distinguished from this court's recent holding in *Bigby*, where we found that Bigby's mitigation evidence of his mental illness could not be considered within the context of the future dangerousness special issue because the evidence indicated that his condition could not be adequately controlled or treated. *Bigby*, 402 F.3d at 571. In *Bigby*, "[t]he defense psychiatrist testified that . . . medication was not sufficient to control his behavior and thinking." *Id*. Dr. Mark and Dr. Grigson concluded the opposite, that Coble's mental illness *could* be controlled with medication.

Next, Coble argues that the jury instructions deprived the jury of an effective vehicle with which to consider his mitigating evidence of a troubled childhood. Prior to the Supreme Court's decision in *Tennard*, this court consistently held that evidence of child abuse or a troubled childhood did not constitute "constitutionally relevant mitigating evidence." *Hernandez v. Johnson*, 248 F.3d 344, 349 n.15 (5th Cir. 2001) (citing *Davis*, 51 F.3d at 461-62; *Madden v. Collins*, 18 F.3d 304, 308 (5th Cir. 1994)). This court, however, has also held that evidence of a defendant's "unstable" and "transient" childhood could be given effect under the special issues. *Jacobs v. Scott*, 31 F.3d 1319,

1327 (5th Cir. 1994) (citing *Graham v. Collins*, 506 U.S. 461 (1993)). In *Jacobs*, we distinguished evidence of a troubled childhood offered by the defendant from that in *Penry I*. *Id.* Jacobs argued that:

> evidence was presented showing that Mr. Jacobs had an unstable, troubled childhood. He never knew his mother, and has only vague memories of his father. His father left him to live alone with strangers when he was a small boy, and Mr. Jacobs never saw him again. Mr. Jacobs ended up living in several foster homes as a child, separated from his sister, parents, and all other family connections.

*Id.* Coble had a troubled childhood similar to that of Jacobs and Graham, "as opposed to a childhood rife with harsh physical abuse like that of Penry." *Id.* Coble's evidence of his troubled childhood included: (1) the death of his father before he was born; (2) poverty in childhood; (3) his stepfather's alcoholism and conflicts with his mother; and (4) his mother's nervous breakdown. His evidence of his childhood is more "transient" and "unstable," like the evidence presented in *Jacob* and *Graham* than it is similar to Penry's evidence of abuse. Coble's evidence is distinguishable from that in *Penry*. The abuse suffered by Penry resulted in a mental impairment that caused Penry to be in some way unable to learn from his mistakes. *See Penry I*, 492 U.S. at 323. It is this inability to learn from one's mistakes that suggests a "yes" to the future dangerousness special issue and prevents the jury from being able to properly consider the defendant's abusive childhood as mitigating evidence. Coble does not argue that his troubled childhood resulted in any mental impairment that prevented him from learning from his mistakes. Therefore, we reject his contention that the Texas special issues did not provide an adequate vehicle for the jury to make a reasoned moral response to Coble's mitigating evidence of his troubled childhood.

Finally, Coble argues that the jury could not consider the evidence of his good character within the second special issue. Coble presented evidence that: (1) he was involved with various

-26-

youth programs over the years; (2) he had a good relationship with his son; (3) he got along well with co-workers; (4) he joined the Marines and served in Vietnam; and (5) he served as a section leader in the U.S. Army reserves and was well respected. "Evidence of good character tends to show that the crime was an aberration, which may support a negative answer to the special issue regarding the future dangerousness of the defendant." *Boyd v. Johnson*, 167 F.3d 907, 912 (5th Cir. 1999). Therefore, as this court has previously held, "[good character] evidence can find adequate expression under [the] second special issue." *Barnard v. Collins*, 958 F.2d 634, 640 (5th Cir. 1992). *See also Boyd*, 167 F.3d at 912; *Graham*, 950 F.2d at 1032-33.

2

The first special issue, as discussed *supra*, asked the jury to determine whether the defendant had acted "deliberately, and with the reasonable expectation that the death of the deceaseds or another would result." In addition, the court instructed the jury that "'deliberately' has a meaning different and distinct from the word 'intentionally' as that word was previously defined in the charge on guilt and the word 'deliberately' as used in the first special issue means a manner of doing an act characterized by or resulting from careful consideration, a conscious decision involving a thought process which embraces more than mere will to engage in the conduct."[15]

The State argues that since Coble's jury was provided with a definition of "deliberateness," as suggested in *Penry I* and *Penry II*, that such a definition, as in *Davis*, cured any potential *Penry* error. The State asserts that *Davis* indicated that a jury instruction defining deliberateness as

_____

[15] A nearly identical definition of "deliberate" was considered by this court in *Davis*, 51 F.3d at 462. "Deliberate" in that case was defined as "a manner of doing an act characterized by or resulting from careful consideration: 'a conscious decision involving a thought process which embraces more than mere will to engage in the conduct.'" *Id*.

-27-

involving "careful consideration" would allow a jury to consider Davis' evidence of "uncontrollable impulses or lack of evaluation" due to his mental illness. Thus, the State concludes that a similar definition allowed Coble's jury to give effect to his evidence of mental illness when answering the first special issue. The State's argument, however, was considered and rejected by this court in *Bigby*. We determined that "[w]hile the state's argument ) ) that any defect described in *Penry* with regard to the first interrogatory was cured because 'deliberately' was defined ) ) is persuasive, we find that the definition given by the state trial court was not sufficient to cure the infirmities found by the Supreme Court." *Bigby*, 402 F.3d at 570 n.7.

In *Lucas*, this court rejected the argument that the Texas "special issue" interrogatories did not allow the jury to consider mitigating evidence of mental illness and childhood abuse. 132 F.3d at 1082. Experts at trial testified that Lucas was psychotic and suffered from schizophrenia, and that at the time of the murder Lucas would have been out of touch with reality and out of control over his impulses. *Id*. This court held that "[i]t is clear to us that the sentencer could have effectively considered the mitigating aspect of such evidence under the first interrogatory, that is, whether Lucas acted deliberately when he committed the murder." *Id*. However, in *Bigby* this court distinguished *Lucas*, stating that:

> Although Bigby's history of mental illness was relevant to whether he acted deliberately, it also spoke to his moral culpability. Importantly, Bigby's evidence indicated that his schizophrenia was chronic and severe, caused him to suffer delusions with respect to the actions and motivations of the people around him, could not be adequately treated, and significantly impacted his interpersonal relationship abilities. Inquiry into whether Bigby acted deliberately fails to fully account for the potential impact [schizophrenia] may have upon the jury's perception of Bigby's moral responsibility for his crimes.

*Bigby,* 402 F.3d at 571. Therefore, this court concluded that the first special issue did not allow the jury to adequately consider the effect of Bigby's mitigating evidence of mental illness.

Dr. Mark testified that Coble's depression ) ) as a result of his post-traumatic stress disorder and bipolar disorder ) ) caused Coble to lose control of himself during the commission of the crimes. Similarly, Dr. Grigson testified that Coble's depression resulted in irrational and illogical behavior.

Having determined that the jury had an adequate means, through the second special issue, to consider Coble's mitigating evidence of mental illness, we need not consider whether the first special issue provides another, separate, adequate means. We therefore decline to determine when the first special issue provides a vehicle with which to consider mitigating evidence of mental illness, as in *Lucas*, as opposed to where the "deliberateness" special issue fails to adequately allow the jury to consider the effect of this evidence, as in *Bigby*.

3

The Supreme Court held in *Penry II* and *Smith* that the "supplemental instruction" provided "an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence." *Penry II*, 532 U.S. at 800; *see also Smith*, 125 S. Ct. at 406-07. Coble received a nearly identical "supplemental instruction" to the one the Supreme Court considered in *Penry II* and *Smith*. However, the supplemental instruction given in addition to the special issue interrogatories is *only* unconstitutional where the special issue questions themselves are not broad enough to provide a vehicle for the jury to give effect to the defendant's mitigation evidence. *Bigby*, 402 F.3d at 570 (citing *Robertson v. Cockrell*, 325 F.3d 243, 258 (5th Cir. 2003)). If the jury can give full effect to mitigating evidence in answering the special issues, the nullification instruction does not require the jury to change a truthful "yes" answer to an untruthful "no" answer in order to give credence to the mitigating evidence. *See Penry II*, 532 U.S. at 797. The nullification instruction in such cases would not place the mitigating evidence beyond the effective reach of the jury. Any error in giving the

-29-

nullification instruction would be harmless and thus there would be no basis for habeas relief. *Bigby*, 402 F.3d at 570.

Since we hold that all of Coble's mitigating evidence could be given effect within the special issue questions, simply receiving the nullification instruction did not place Coble's evidence beyond the effective reach of the jury. Therefore, the state court's adjudication of Coble's *Penry* claim was not "contrary to, [and did not involve] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

V

For the foregoing reasons, we AFFIRM the district court's dismissal of Coble's habeas petition.