# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 19, 2010

No. 08-70042

Lyle W. Cayce
Clerk

ANTHONY L PIERCE

Petitioner-Appellee Cross-Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent-Appellant Cross-Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before KING, DENNIS, and OWEN, Circuit Judges.

KING, Circuit Judge:

The petitioner–appellee, Anthony L. Pierce, was sentenced to death in 1986 in Texas state court for a murder committed during the course of a robbery in 1977. After exhausting his state-court avenues for postconviction relief in 2007, he sought habeas relief under 28 U.S.C. § 2254 in federal district court. The district court vacated Pierce's death sentence and ordered resentencing, finding that the statutory special issues presented to the jury at Pierce's sentencing did not permit the jury to give meaningful consideration and effect to all of Pierce's mitigating evidence, as *Penry v. Lynaugh*, 492 U.S. 302 (1989), requires. The district court denied Pierce's other asserted bases for habeas relief

No. 08-70042

and denied a certificate of appealability (COA).   The State appealed the resentencing.  Pierce, in turn, sought a COA from this court on six of the issues raised before the district court.  We granted a COA as to two of those issues: Whether Pierce received ineffective assistance of counsel at sentencing, and whether Pierce was mentally retarded and therefore ineligible for the death penalty under  *Atkins v. Virginia*, 536 U.S. 304 (2002).

We now affirm the district court's grant of resentencing under *Penry*. Because we affirm resentencing on that basis, we do not address whether Pierce's ineffective assistance of counsel claim provides an alternate basis for resentencing.   We affirm the district court's denial of habeas relief and an evidentiary hearing on Pierce's *Atkins* claim.  The reasons for these rulings are explained below.

## I.  BACKGROUND

The district court's exhaustive opinion more than adequately documents the factual background and procedural development of this case.  *See Pierce v. Quarterman*, No. H-07-1561, 2008 WL 4445064 (S.D. Tex. Sept. 26, 2008).  Here, we recite only so many of the facts and procedure as are necessary to our analysis of the *Penry* and *Atkins* claims.

Anthony L. Pierce was convicted of capital murder for the shooting death of Fred Eugene Johnson, the manager of a Church's Chicken in Houston, during a robbery of that restaurant on August 4, 1977.  Pierce's first two convictions were overturned by the Texas Court of Criminal Appeals (TCCA), in both cases because the trial court had improperly overruled defense counsel's challenges to certain venire members.  *See Pierce v. State*, 604 S.W.2d 185 (Tex. Crim. App. 1980); *Pierce v. State*, 696 S.W.2d 899 (Tex. Crim. App. 1985).  Pierce was tried and convicted a third time and sentenced to death in 1986.  The TCCA affirmed the conviction and sentence, *Pierce v. State*, 777 S.W.2d 399 (Tex. Crim. App. 1989), *cert. denied*, 496 U.S. 912 (1990), and denied his application for

No. 08-70042

postconviction relief, *Ex parte Pierce*, No. 15,859-03 (Tex. Crim. App. Sept. 19, 2001).  On August 29, 2002, Pierce filed a successor state habeas application in which he contended that he was mentally retarded and therefore ineligible for the death penalty under *Atkins*.  The TCCA denied the application on April 18, 2007.  *Ex parte Pierce*, No. 15,859-04, 2007 WL 1139414 (Tex. Crim. App. Apr. 18, 2007).  Pierce filed a 28 U.S.C. § 2254 federal habeas petition on May 9, 2007, an amended federal habeas petition on August 30, 2007, and a supplemental federal habeas petition on July 1, 2008.

On cross-motions for summary judgment, the district court granted Pierce habeas relief on one of his sentencing claims, concluding that the special issues presented to the jury at the sentencing phase did not permit the jury to give meaningful consideration and effect to all of Pierce's mitigating evidence, in violation of *Penry*.  The district court denied the remaining asserted bases for habeas relief and *sua sponte* denied a COA on those issues.  *See Pierce v. Quarterman*, No. H-07-1561, 2008 WL 4445064 (S.D. Tex. Sept. 26, 2008).  We granted a COA as to Pierce's claims that he received ineffective assistance of counsel at the sentencing phase and that because he is mentally retarded, his execution is precluded by *Atkins*.  We ordered (and have received several rounds of) supplemental briefing as to these issues and denied a COA as to all other issues.

## II.  STANDARD OF REVIEW

This habeas proceeding is subject to the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, because Pierce filed his federal petition on May 9, 2007, well after AEDPA's effective date.  *See Lindh v. Murphy*, 521 U.S. 320, 336–37 (1997).  Under AEDPA, a federal court may not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state court's adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A "rule[ ] of law may be sufficiently clear for habeas purposes even when [it is] expressed in terms of a generalized standard rather than as a bright-line rule." *Williams v. Taylor*, 529 U.S. 362, 382 (2000). The relevant "clearly established federal law" is the law that existed at the time the state court's denial of habeas relief became final. *See Abdul–Kabir v. Quarterman*, 550 U.S. 233, 238 (2007); *Williams*, 529 U.S. at 390–94. A state court's factual findings are "presumed to be correct," although a habeas petitioner may rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). We review a district court's refusal to hold an evidentiary hearing for abuse of discretion. *Clark v. Johnson*, 202 F.3d 760, 765–66 (5th Cir. 2000).

### III.  THE *PENRY* ISSUE

The district court vacated Pierce's death sentence and ordered resentencing after concluding that the statutory special issues presented to the jury at sentencing and the prosecutor's closing arguments regarding those special issues precluded the jury from giving meaningful consideration and effect to all of Pierce's mitigating evidence, as *Penry* requires. *Pierce*, 2008 WL 4445064, at *5. The State appeals, arguing that the special issues in fact permitted the jury to give meaningful consideration and effect to the mitigating evidence. The special issues, as prescribed by a now-superseded version of the Texas Code of Criminal Procedure, were:

1)    Whether Pierce's conduct that caused Johnson's death was deliberate and undertaken with the reasonable expectation that the death of the victim or another would result; and

No. 08-70042

2)    Whether there was a probability that Pierce would commit future criminal acts of violence that would constitute a continuing threat to society.

*See* TEX. CODE CRIM. PROC. ANN., art. 37.071(b) (Vernon 1981);[1] *see also* TEX. CODE CRIM. PROC. ANN., art. 37.0711 § 1 (Vernon 2006) (noting that superseded statute applies to offenses committed before September 1, 1991).

## A.    The District Court's Opinion

The district court summarized the mitigating evidence that Pierce presented at sentencing as including that:  Pierce was young at the time of the crime (he had turned eighteen just 15 days before); his behavior in prison while incarcerated at various points both before and after the crime was generally good; he was not a discipline problem as a child and was honest and respectful toward his mother and admitted past wrongs to her; he had matured emotionally and spiritually while in prison; and he had developed intellectually and creatively while in prison, improving his verbal abilities and making crafts, such as picture frames and jewelry boxes.  *Pierce*, 2008 WL 4445064, at *2.  The district court rejected as unreasonable the TCCA's conclusion that the special issues permitted the jury to give meaningful consideration and effect to this mitigating evidence.  Noting that "*Penry* makes clear that jurors must have an opportunity to fully consider the mitigating evidence as it bears on the broader question of the defendant's moral culpability," *id.* at *5 (alterations and internal quotation marks omitted), the district court observed:

---

[1] Pierce properly preserved his objection to the special issues, arguing at the sentencing phase that they did not permit the jury to give meaningful consideration and effect to the mitigating evidence.  Pierce requested, but was denied, the following jury instruction:

You are hereby instructed that you can consider all mitigating circumstances in regards to the punishment of the defendant herein.  Mitigation will not be defined for you; but you may consider the age, race, background, sex, history, and all matters related to this defendant that have been put before you.

5

No. 08-70042

On the face of the special issues, the jury could consider some of Pierce's evidence under the future dangerousness special issue. For example, Pierce's youth at the time of the offense and his behavior in prison are relevant to that issue. Other evidence, however, is irrelevant, or is only partially relevant, to the future dangerousness issue, yet raises questions about Pierce's general moral culpability and character. For example, his honesty and respect toward his mother, his willingness to admit past wrongs, his efforts to improve himself through education, and his work making craft items have little relevance to future dangerousness, but are relevant as to his character.

*Id.* (citations omitted).

The district court also held that the "*Penry* violation was exacerbated by prosecution comments during closing argument," which the district court found "suggest[ed] to the jury that it could not consider Pierce's mitigating evidence at all . . . but could consider only whether the State presented sufficient evidence to merit a 'yes' answer to the special issues." *Id.* The district court concluded that "the special issues in this case, especially when considered in light of the State's closing argument, violated Pierce's rights under *Penry*." *Id.* at *6. Accordingly, the district court vacated Pierce's death sentence with instructions that the state court grant a new sentencing hearing or resentence Pierce to a sentence less than death in accordance with Texas law in effect at the time of Pierce's crime.

## B.    Pierce's Additional Mitigating Evidence

Pierce contends that additional mitigating evidence that he presented at sentencing and raised in his state habeas application and federal habeas petition, but that the district court did not discuss in its *Penry* analysis, provides further support for the district court's conclusion.[2] Pierce cites the testimony of

---

[2] Pierce contends that there was substantial mitigating evidence that his trial counsel did not present at sentencing. This evidence included that Pierce: was borderline mentally retarded; was severely abused by his alcoholic father; grew up in extreme poverty in a violent neighborhood; and suffered from "horrific headaches" and other health problems as a child.

No. 08-70042

his mother, Erline Pierce, that he was a good child with few behavioral problems until he was 13 or 14 years old, when he fell in with a crowd of older boys who exerted a bad influence. Erline Pierce further testified that, as a result of this corrupting influence, Pierce was sent to the Texas Youth Council (TYC)[3] twice for extended juvenile detention stays as a young teenager. She commented that Pierce had been "locked up most of his young life," so he "couldn't have a chance." Erline Pierce testified that her son had regularly attended church growing up and "still ha[d] those same beliefs" after his arrest. Finally, Erline Pierce testified that her son had emotionally matured and improved himself in prison by furthering his education, developing his reading skills, and developing his talent for art and woodworking by making jewelry boxes and picture frames for her.

Pierce also cites the testimony of Sister Isabella Estrada, a principal for Holy Cross School in Bay City, Texas. Sister Estrada testified that she got to know Pierce during his years on death row, and she visited him regularly in the four years leading up to Pierce's third trial. She testified that Pierce grew from being depressed and angry about his situation to being more understanding. As he developed his ability to speak and articulate his thoughts, Pierce became more open and able to communicate his feelings.

Pierce also cites comments by the prosecutor during voir dire that he asserts "conditioned" the prospective jurors to disregard his mitigating evidence. In one such instance, the prosecutor stated:

---

Counsel's failure to present such evidence, however, does not provide a basis for a *Penry* claim, and Pierce does not urge this evidence in support of his *Penry* claim. "[W]e have held that a petitioner cannot base a *Penry* claim on evidence that could have been but was not proffered at trial." *Miniel v. Cockrell*, 339 F.3d 331, 338 (5th Cir. 2003) (internal quotation marks omitted).

[3] The Texas Legislature changed the name of the Texas Youth Council to the Texas Youth Commission in 1983. *See* Texas Youth Commission, TYC History, at http://www.tyc.state.tx.us/about/history.html (last visited February 23, 2010).

7

No. 08-70042

Q.    Would you also agree that under our law that the age of an individual, whether that be old or young age, in and of itself does not give anyone any special rights?  Under our law when a person becomes the age of 17 they are an adult and are treated as such.  Would you agree?

A.    Yes, sir.

Q.    Okay.  So in that instance whether a person is 17 or they're 85, the law doesn't ask how old you are, what color you are, what your job is, what your sex is, what your education is, it asks that you follow certain norms and those norms determine the interaction between human beings and violation of those be tried by a jury if it be a criminal.  Can you follow that concept in the purposes of our law?

A.    Yes, sir, I believe so.

The prosecutor also sought and obtained the juror's oral confirmation that if the juror concluded that the answer to the two special issues was "yes," he would not "change one of those answers to no just to prevent the defendant from receiving the death sentence."

Similarly, to another prospective juror, the prosecutor asked:

Q.    Now, would you agree with me . . . that our law doesn't distinguish as far as finding someone guilty in the law as it relates to an individual on the basis of their age or sex, their race or ethnic background? . . . I'm saying that our law, as far as making a person guilty or being charged with capital murder—like that doesn't distinguish whether or not that person happens to be 17 or 18 or black or white or a doctor or what I'm saying is race, sex, occupation, ethnic background, as far as whether or not they violate the law.

A.    I agree.

Q.    And would you feel that if the State presented evidence to you on Special Issue No. 2 that was beyond a reasonable doubt that the answer to Special Issue No. 2 should be "yes" and you found that perhaps that individual was a particular age, a young person or so,

8

No. 08-70042

would you necessarily answer that question "no" because of the age or despite what the State showed you?

A.    No.

The State contends that the Texas special issues in fact permitted the jury to give meaningful consideration and effect to all of the mitigating evidence presented and rejects the proposition that any of the prosecutor's comments during voir dire or closing argument could have interfered with the jury's ability to do so.

## C.    The Legal Framework

### 1.    *Abdul–Kabir* and *Brewer*

The Supreme Court most recently addressed the Texas special issues in *Abdul–Kabir*, 550 U.S. 233, and *Brewer v. Quarterman*, 550 U.S. 286 (2007).[4]

---

[4] *Abdul–Kabir and Brewer* clarified a long and contentious line of cases in which the Court grappled with whether the Texas special issues provide a basis for the jury to give meaningful consideration and effect to mitigating evidence in considering a death sentence. *See Jurek v. Texas*, 428 U.S. 262 (1976) (upholding the facial constitutionality of the Texas special issues sentencing scheme but leaving room for as-applied challenges); *Franklin v. Lynaugh*, 487 U.S. 164 (1988) (rejecting as-applied challenge, reasoning that evidence of good prison behavior did not have mitigating significance independent of its relevance to the future dangerousness special issue); *Penry*, 492 U.S. 302 (concluding that habeas relief was appropriate because the special issues did not provide a basis for jury to give meaningful consideration and effect to evidence of low IQ, organic brain disorder, abusive upbringing, and antisocial personality disorder); *Graham v. Collins*, 506 U.S. 461 (1993) (declining to decide whether Texas special issues could give constitutionally adequate effect to mitigating evidence of good character and youth because law was not clearly established in 1984, when the conviction become final); *Johnson v. Texas*, 509 U.S. 350 (1993) (concluding, on direct review, that the petitioner's youth at the time of the crime could be given meaningful consideration and effect under the future dangerousness special issue); *Penry v. Johnson*, 532 U.S. 782, 799 (2001) (*Penry II*) (concluding that additional special instruction that allowed jury to nullify special issues if it concluded that other mitigating circumstances existed was constitutionally infirm because it "made the jury charge as a whole internally contradictory"); *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (rejecting a heightened-relevance standard applied by the Fifth Circuit that "has no foundation in the decisions of this Court"); *Smith v. Texas*, 543 U.S. 37 (2004) (per curiam) (holding that the special issues in combination with general nullification instruction did not allow the jury to give meaningful consideration and effect to mitigating evidence of learning disability, low IQ score, childhood abuse, and troubled upbringing).

No. 08-70042

These cases describe the "clearly established law" as it existed in 1999 and 2001, respectively, and *Abdul–Kabir* indicates that the same clearly established law existed as early as 1990. *Abdul–Kabir*, 550 U.S. at 238; *Brewer*, 550 U.S. at 294–95. *Abdul–Kabir* instructs that the relevant state-court judgment for purposes of review under AEDPA is the judgment adjudicating the merits of the petitioner's state habeas application. 550 U.S. at 238. The TCCA rejected Pierce's petition for habeas relief in 2001. Therefore, the "clearly established law" described in *Abdul–Kabir* and *Brewer* controls this case.

This circuit has construed *Abdul–Kabir* and *Brewer* as imposing a two-part test to determine whether resentencing is required: First, the reviewing court must determine whether the mitigating evidence presented by the petitioner satisfies the "'low threshold for relevance' articulated by the Supreme Court." *Coble v. Quarterman*, 496 F.3d 430, 444 (5th Cir. 2007).[5] If the relevance threshold is met, the court must determine "whether there was a reasonable

---

[5] The Court set out the threshold for relevance in *Tennard v. Dretke*, 542 U.S. 274 (2004), commenting:

> [T]he meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard—any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence—applies. . . .

> Once this low threshold for relevance is met, the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence.

542 U.S. at 284–85 (internal quotation marks omitted). The *Brewer* majority emphasized that the focus of the relevance inquiry is not on the "quantity, degree, or immutability" of the mitigating evidence offered, but rather on whether the evidence, whatever it is, "has mitigating relevance to the special issues" and "may diminish a defendant's moral culpability for the crime." *Brewer*, 550 U.S. at 294. A footnote of dicta in *Abdul–Kabir*, however, suggests an important limitation, stating that no special instruction is required when the "mitigating evidence has only a tenuous connection—*some* arguable relevance—to the defendant's moral culpability." *Abdul–Kabir*, 550 U.S. at 254 n.14 (internal quotation marks omitted). An additional special instruction is necessary only "when the defendant's evidence may have *meaningful* relevance to the defendant's moral culpability beyond the scope of the special issues." *Id.* at 254 n.14 (emphasis added; internal quotation marks omitted).

10

likelihood that the jury applied the special issues in a manner that precluded it from giving meaningful consideration and effect to all of [the petitioner's] mitigating evidence." *Id.* Both *Abdul–Kabir* and *Brewer* emphasize "the importance of allowing juries to give *meaningful* effect to *any* mitigating evidence providing a basis for a sentence of life rather than death." *Abdul–Kabir*, 550 U.S. at 260 (emphasis added); *accord Brewer*, 550 U.S. at 296 ("[T]he jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death.").[6] In particular, the Texas special issues will be constitutionally insufficient as applied when the mitigating evidence presented supports an "entirely different reason for not imposing a death sentence" than permitted by the special issues. *Abdul–Kabir*, 550 U.S. at 259. *Abdul–Kabir* and *Brewer* also indicate that courts should consider whether the prosecutor's comments to the jury may have "undermined" the jury's ability to give meaningful consideration and effect to all of the petitioner's mitigating evidence by suggesting that the jurors may not consider mitigating evidence for relevance outside the special issues. *Abdul–Kabir*, 550 U.S. at 261; *Brewer*, 550 U.S. at 291.

---

[6] Before *Abdul–Kabir* and *Brewer*, this circuit characterized the standard as requiring that the jury be able to "fully consider[ ] and giv[e] full effect to all of the defendant's mitigating evidence." *Nelson v. Quarterman*, 472 F.3d 287, 293 (5th Cir. 2006) (en banc) (citing *Tennard v. Dretke*, 542 U.S. 274, 288–89 (2004)). Since *Abdul–Kabir* and *Brewer*, this circuit has concluded that the "meaningful effect" and "full consideration and effect" standards are the same. *See Coble v. Quarterman*, 496 F.3d 430, 447 n.15 (5th Cir. 2007) (rejecting the State's assertion that the "meaningful effect" standard was less stringent; holding that "[r]egardless of the descriptor attached to it, the substance of the standard articulated . . . is the same"). This conclusion finds support in *Brewer*, where the Court criticized this circuit for applying a "sufficient effect" test rather than a "full effect" test in evaluating Brewer's habeas petition. 550 U.S. at 295. Both parties cite the "full consideration and effect" formulation from *Nelson* rather than the "meaningful effect" formulation from *Abdul–Kabir* and *Brewer*. Because this circuit has concluded that the standards are identical, *see Coble*, 496 F.3d at 447 n.15, we cite the Supreme Court's "meaningful effect" formulation.

11

No. 08-70042

## 2.    *Franklin* and *Penry*

The standard embraced by the Court in *Abdul–Kabir* and *Brewer* was first articulated by Justice O'Connor in her concurrence to *Franklin*, 487 U.S. 164. In *Franklin*, the petitioner presented evidence at sentencing that he had behaved well in prison. *Id.* at 177. The plurality opinion concluded that the future dangerousness special issue provided a sufficient vehicle for the jury to consider the mitigating evidence. *Id.* at 179–180. The plurality rejected the petitioner's contention that an additional instruction was required because the mitigating evidence of good behavior in prison had relevance beyond the scope of the special issues. *Id.* at 181. The plurality reasoned that "we have never concluded that States cannot channel jury discretion in capital sentencing" and rejected the argument that the jury must be able to consider mitigating evidence for every issue to which it may be relevant. *Id.*

Justice O'Connor concurred with the plurality that the special issues were constitutionally sufficient as applied because the "petitioner did not suggest that his lack of disciplinary violations [in prison] revealed anything more positive about his character" than lack of future dangerousness. *Id.* at 186 (O'Connor, J., concurring). But Justice O'Connor disagreed that the special issues would be constitutionally sufficient if the mitigating evidence presented in fact had relevance beyond their scope—for example, to "personal culpability" or "character." *Id.* at 184–86. She commented:

> If . . . petitioner had introduced mitigating evidence about his background or character or the circumstances of the crime that was not relevant to the special verdict questions, or that had relevance to the defendant's moral culpability beyond the scope of the special verdict questions, the jury instructions would have provided the jury with no vehicle for expressing its "reasoned moral response" to that evidence. . . . In my view, however, this is not such a case. The only mitigating evidence introduced by petitioner was the stipulation that he had no record of disciplinary violations while in prison. . . . While it is true that the jury was prevented from giving mitigating

12

effect to the stipulation to the extent that it demonstrated positive character traits other than the ability to exist in prison without endangering jailers or fellow inmates, that limitation has no practical or constitutional significance in my view because the stipulation has no relevance to any other aspect of petitioner's character. . . .

The limited probative value of the stipulation regarding petitioner's lack of prison disciplinary violations is best illustrated by the contrasting examples of probative character evidence suggested by the dissent. . . . Evidence of voluntary service, kindness to others, or of religious devotion might demonstrate positive character traits that might mitigate against the death penalty. Although petitioner argued to the sentencing jury that his prison record demonstrated his lack of future dangerousness, petitioner did not suggest that his lack of disciplinary violations revealed anything more positive about his character than that.

*Id.* at 185–86.

The Court adopted Justice O'Connor's *Franklin* concurrence in *Penry*, 492 U.S. 302, in an opinion which Justice O'Connor also wrote. There, the majority concluded that although the deliberateness and future dangerousness special issues allowed the jury to give *partial* consideration to the petitioner's mitigating evidence of mental retardation and childhood abuse, the Eighth Amendment was not satisfied because the mitigating evidence had "relevance to his moral culpability beyond the scope of the special issues, and . . . the jury was unable to express its 'reasoned moral response' to that evidence in determining whether death was the appropriate punishment." *Id.* at 322.

## D.    Analysis

The parties do not dispute that the mitigating evidence that Pierce presented at his sentencing satisfies the "low threshold for relevance articulated by the Supreme Court." *Coble*, 496 F.3d at 444 (internal quotation marks omitted). Instead, the parties dispute whether the Texas special issues provided the jury with a basis to give meaningful consideration and effect to the

mitigating evidence that Pierce presented. The State contends that the Supreme Court has already ruled, over a series of cases, that the special issues provide jurors with a meaningful basis to consider all of the types of mitigating evidence that Pierce presented at sentencing. The State urges that under the *Penry* line, the special issues are only inadequate "where the defendant offers evidence of mental retardation or mental defect or childhood abuse or, perhaps, [childhood] hardship"—types of evidence that the State contends Pierce did not present in this case. Pierce counters that the Supreme Court has never taken a categorical approach to determining whether the special issues provide a basis for giving meaningful consideration and effect to various types of mitigating evidence, and he argues that the special issues did not provide such a basis in this case. Pierce also urges that the prosecutor's comments to the jury during voir dire and at closing—which downplayed the mitigating effects of Pierce's youth and suggested that the jury lacked discretion to consider mitigating evidence outside the confines of the special issues—further deprived the jury of a basis for meaningful consideration of Pierce's mitigating evidence.

The first issue is whether the special issues provided a basis for the jury to give meaningful consideration and effect to each type of mitigating evidence that Pierce introduced. The second issue is whether there is a reasonable probability that the prosecution's voir dire questioning or closing arguments operated to undermine the jury's ability to give such consideration. Pierce's mitigating evidence falls into the following general categories: youth at the time the crime was committed, good behavior in prison, troubled childhood, and good character. We address these categories of mitigating evidence, and the possible effects of the prosecutor's comments to the jury, in turn.

### 1.    Youth and Good Behavior in Prison

As the district court recognized, under clearly established federal law, the future dangerousness special issue provided a meaningful basis for the jury to

consider and give effect to Pierce's youth—he had just turned 18 at the time of the killing—and his good behavior in prison.  In *Johnson v. Texas*,  509 U.S. 350, 369 (1993), the Court held that the future dangerousness special issue gave the jury "a meaningful basis to consider the relevant mitigating qualities of petitioner's youth," reasoning that

> the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside. . . .  [T]here is ample room in the assessment of future dangerousness for a juror to take account of the difficulties of youth as a mitigating force in the sentencing determination.

*Id*. at 368.   The *Abdul–Kabir* majority reiterated that youth "has special relevance to the question of future dangerousness" because it is "a universally applicable mitigating circumstance that every juror has experienced and which necessarily is transient."   550 U.S. at 261.   The *Franklin* plurality and concurrence (a total of five Justices) agreed that the future dangerousness special issue also allows the jury to give meaningful consideration and effect to a petitioner's good behavior in prison.  487 U.S. at 177–78, 185–86.  The Court has not overruled this precedent.  *See Garcia v. Quarterman*, 257 F. App'x 717, 722 (5th Cir. 2007) (per curiam) (applying *Franklin* to reject the petitioner's *Penry* claim premised on mitigating evidence of good behavior in prison).  The special issues provided a basis for the jury to give meaningful consideration and effect to the mitigating evidence of Pierce's youth and good behavior in prison.

### 2.    Troubled Childhood

Pierce also urges as mitigating evidence his mother's testimony that he was a good boy until falling in with the wrong crowd when he was thirteen or fourteen years old, and that he spent much of his young life "locked up" during two extended stays in juvenile detention at the TYC.  Pierce argues that this is evidence of a "troubled childhood"—evidence of a type that the Court held in

*Abdul–Kabir* and *Brewer* has mitigating relevance beyond the special issues because it bears on a defendant's moral culpability. *See Abdul–Kabir*, 550 U.S. at 256–57 (noting that evidence of a "rough childhood" has "mitigating force beyond the scope of the special issues"); *Brewer*, 550 U.S. at 293–94 (finding a *Penry* violation because focus on special issues would "necessarily disregard[ ] any independent concern that, given Brewer's troubled background, he may not be deserving of a death sentence"). The State counters that Pierce's evidence is different in kind than the "troubled childhood" evidence at issue in those cases because those cases involved circumstances outside the petitioner's control—such as poverty and childhood abuse—while Pierce's evidence is limited to "his self-inflicted problems with the law."

The case law does not support the distinction that the State urges. In *Brewer*, for example, the Court concluded that an additional instruction was necessary in order to allow the jury to consider and give effect to evidence that the petitioner's "co-defendant, a woman with whom he was apparently obsessed, dominated and manipulated him," and that the petitioner had a history of substance abuse. 550 U.S. at 289–290 (internal quotation marks omitted). The *Brewer* majority concluded that there was a reasonable likelihood that the special issues led the jury to "disregard[ ] any independent concern that, given Brewer's troubled background, he may not be deserving of a death sentence," and therefore deprived the jury of the opportunity to respond to the petitioner's mitigating evidence in a "reasoned moral manner." *Id.* at 294, 296. Similarly, this circuit has held that evidence of a petitioner's substance abuse might have "meaningful mitigating relevance beyond its tendency to disprove that [the petitioner] acted deliberately" and therefore requires an additional instruction. *Garcia*, 257 F. App'x at 722 (internal quotation marks omitted). Both of these cases involved mitigating evidence that was arguably "self-inflicted" (to use the State's term), but recognized that this evidence might nevertheless have

16

mitigating relevance to the petitioner's moral culpability—and therefore relevance outside the special issues.  These holdings are consistent with the requirement that juries be allowed "to give *meaningful* effect to *any* mitigating evidence providing a basis for a sentence of life rather than death." *Abdul–Kabir*, 550 U.S. at 260 (emphases added).  Consistent with these precedents, Pierce's evidence of being led astray by older boys and being locked up for a significant period of time at the TYC had mitigating relevance beyond the special issues and therefore required an additional instruction.

### 3.    Good Character

Pierce introduced evidence of his good character before the crime, including that he was kind to his mother, was honest and admitted past wrongs to her, and regularly attended church.  Pierce also presented evidence of his good character as it developed after he committed the crime.  This evidence included that he had matured emotionally and spiritually while in prison, developing his ability to speak and articulate his thoughts and becoming more open and able to communicate his feelings.  Pierce also matured in prison by furthering his education, improving his reading skills, and developing his talent for art and woodworking.

In *Franklin*, five Justices (two concurring, three dissenting) indicated, in dicta, that the special issues would not allow a jury to give meaningful consideration and effect to this type of "good character" evidence.  Justice O'Connor's concurrence stated that although the petitioner's evidence of good behavior in prison lacked relevance to any issue other than future dangerousness, had the petitioner presented "[e]vidence of voluntary service, kindness to others, or of religious devotion," an additional instruction would have been required:

> [i]f [the] petitioner had introduced mitigating evidence about his
> background or character or the circumstances of the crime that was

17

not relevant to the special verdict questions, or that had relevance to the defendant's moral culpability beyond the scope of the special verdict questions, the jury instructions would have provided the jury with no vehicle for expressing its "reasoned moral response" to that evidence.

487 U.S. at 185–86 (O'Connor, J., concurring). Justice Stevens's dissent likewise emphasized that character evidence of this type "may suggest that the conduct of which the defendant stands convicted was not in keeping with his or her usual qualities or traits, a fact that has as much relevance to culpability as to future dangerousness." *Id.* at 190 (Stevens, J., dissenting).

Since *Franklin*, the Court's jurisprudence on California's death penalty statute[7] has repeatedly held that character evidence has relevance to a petitioner's moral culpability. *See, e.g., Ayers v. Belmontes*, 549 U.S. 7, 15 (2006) (noting that good character evidence may "extenuate[ ] the gravity of the crime"); *Brown v. Payton*, 544 U.S. 133, 142–43 (2005) (commenting on the relevance of good character evidence as a means of "lessen[ing] or excus[ing] a defendant's culpability"); *Boyde v. California*, 494 U.S. 370, 382 n.5 (1990) (commenting on relevance of good character evidence as a means of showing "character strengths in the face of . . . difficulties" and showing that "criminal conduct was an aberration from otherwise good character").[8] Evidence of "postcrime character transformations" is also relevant:

> [T]o accept the view that such evidence could not be relevant to moral culpability] because it occurred after the crime, one would have to reach the surprising conclusion that remorse could never serve to lessen or excuse a crime. But remorse, which by definition

---

[7] California's death penalty statute sets out eleven factors "that the trier of fact shall take into account . . . if relevant." Relevant here is factor (k), which instructs the trier of fact to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." CAL. PENAL CODE ANN. § 190.3(k) (West 2008).

[8] As a direct appeal, *Boyde* was not governed by AEDPA. 494 U.S. at 376.

can only be experienced after a crime's commission, is something commonly thought to lessen or excuse a defendant's culpability.

*Brown*, 544 U.S. at 142–43; *see also Ayers*, 549 U.S. at 15–16 (noting that it would be "counterintuitive if a defendant's capacity to redeem himself through good works [after the crime] could not extenuate his offense and render him less deserving of a death sentence"). *Ayers* and *Brown* set out the clearly established law as it existed in 1994. 549 U.S. at 10; 544 U.S. at 139. *Boyde* was a direct appeal decided in 1990, well before the denial of Pierce's state habeas application became final in 2001. All of these authorities set out the clearly established law for purposes of this case.

The Court has addressed good character evidence in the context of the Texas special issues only once since *Franklin*, in *Graham v. Collins*, 506 U.S. 461 (1993). The State urges that *Graham* stands for the proposition that the special issues allow juries to give meaningful consideration and effect to good character evidence. In *Graham*, the Court considered the petitioner's mitigating evidence that he had a transient upbringing, was a generous person, and "loved the Lord." *Id*. at 464 (alterations omitted). The Court stated, in dicta, that the special issues allowed the jury to give at least *some* effect to this character evidence, and indicated that *some* effect was all that was constitutionally required. *Id*. at 476–77. *Graham*'s actual holding, however, was that under the law as it existed in 1984 (the year the petitioner's conviction became final) the relief that the petitioner sought would have constituted a new rule, in violation of *Teague v. Lane*, 489 U.S. 288 (1989). *Id*. at 477. The *Abdul–Kabir* majority took pains to distinguish *Graham*'s "some effect" language as dicta, 550 U.S. at 258–59, as did this court in *Nelson*, in which we rejected the State's contention that *Graham* altered the requirement that the jury be able to give "full consideration and full effect to the capital defendant's mitigating evidence," 472 F.3d at 298 ("Because the [*Graham*] Court disposed of the case on *Teague*

19

grounds, it did not address the substantive merits of the petitioner's *Penry* claim.").[9]

Both *Abdul–Kabir* and *Brewer* emphasize "the importance of allowing juries to give *meaningful* effect to *any* mitigating evidence providing a basis for a sentence of life rather than death." *Abdul–Kabir*, 550 U.S. at 260 (emphasis added). The California cases establish that good character evidence has meaningful relevance to moral culpability, which a majority of the Justices in *Franklin* indicated is not encompassed by the special issues. These authorities establish that an additional instruction was required in order for the jury to consider and give effect to this mitigating evidence.

### 4.    Effect of Certain Comments to the Jury

In *Abdul–Kabir* and *Brewer*, the Court indicated that a prosecutor's comments to the jury at voir dire and at closing may further impede the ability of the jury to give meaningful consideration and effect to mitigating evidence. Pierce complains that the prosecutor, at his sentencing, impressed upon the jurors in closing argument that they could not consider evidence with relevance beyond the special issues:

> You each promised me individually that if the State brought you evidence that convinced you beyond a reasonable doubt that the answers to these special issues would be yes and you knew that a

---

[9] The State cites several cases from this circuit that cite *Graham* for the proposition that "because 'the principal mitigating thrust of good character evidence is to show that the defendant acted atypically in committing the capital crime, *this evidence can find adequate expression under the second special issue.*'" *Bower v. Dretke*, 145 F. App'x 879, 885 (5th Cir. 2005) (per curiam) (quoting *Barnard v. Collins*, 958 F.2d 634, 640 (5th Cir. 1992)); *see also Coble v. Dretke*, 417 F.3d 508, 525 (5th Cir. 2005), *withdrawn and superceded on rehearing*, *Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007) ("'Evidence of good character tends to show that the crime was an aberration, which may support a negative answer to the special issue regarding the future dangerousness of the defendant.'" (quoting *Boyd v. Johnson*, 167 F.3d 907, 912 (5th Cir. 1999))). But these cases predate *Abdul–Kabir* and fail to recognize that *Graham*'s "some effect" language was dicta that the Supreme Court identified as such in *Abdul-Kabir* and this court has since similarly distinguished. *See Nelson*, 472 F.3d at 298, 303.

"yes" answer to each one of these issues would mean the death penalty that you would answer those questions "yes" and that you would never change your answer despite the evidence in this case just so that the death penalty would not be imposed.

As the district court observed, these comments are very similar (indeed, nearly identical) to those that the Court criticized in *Abdul–Kabir*, in which the prosecutor reminded jurors that they had "'promise[d' to] look only at the questions posed by the special issues, which, according to the prosecutor, required the jurors to put the petitioner's mitigating evidence "out of [their] mind[s]" and "just go by the facts." 550 U.S. at 261. The *Abdul–Kabir* Court concluded that these comments had the effect of impermissibly "convinc[ing] jurors that the law compels them to disregard the force of the evidence offered in mitigation" that had relevance outside the special issues. *Id.*

The prosecutor's closing comments in this case are also similar to those that the Court criticized in *Brewer*, where the prosecutor urged the jury that "'you don't have the power to say whether [the petitioner] lives or dies. You answer the questions according to the evidence, much like you did at the guilt or innocence [phase]. That's all.'" *Brewer*, 550 U.S. at 291 (alterations omitted). Finding a *Penry* violation, the *Brewer* Court concluded that "[t]here [wa]s surely a reasonable likelihood that the jurors accepted the prosecutor's argument at the close of the sentencing hearing that all they needed to decide was whether Brewer had acted deliberately and would likely be dangerous in the future, necessarily disregarding any independent concern that, given Brewer's troubled background, he may not be deserving of a death sentence." *Id.* at 293–94 (footnote omitted). To the extent that Pierce presented evidence that could not be given meaningful consideration and effect under the special issues, the prosecution's closing argument may have exacerbated the problem by instructing the jury to consider only the special issues.

Certain of the prosecutor's comments at voir dire were also problematic. The prosecutor elicited agreement from one venire member (who was later selected to serve on the jury) that "under our law . . . the age of an individual . . . in and of itself does not give anyone special rights," and that "whether a person is 17 or they're 85, the law doesn't ask how old you are . . . it asks that you follow certain norms and those norms determine the interaction between human beings and violation of those be tried by a jury . . . ." The prosecutor elicited agreement from another venire member (also selected to the jury) that "our law, as far as making a person guilty or being charged with capital murder—like that doesn't distinguish whether or not that person happens to be 17 or 18 . . . as far as whether or not they violate the law" and the statement that she would not necessarily answer the second special issue "no" because of the defendant's age. The *Abdul-Kabir* majority observed that comments like these, which "tak[e] pains to convince jurors that the law compels them to disregard the force of evidence offered in mitigation," might "undermine[ ]" a jury's ability to give meaningful consideration and effect even to evidence encompassed by the special issues. 550 U.S. at 261. By essentially instructing the venire members that "youth isn't relevant," the comments may have undermined the jury's ability to give mitigating effect to evidence of Pierce's youth through the special issues.

## E.    Conclusion

Under the clearly established law, the special issues provided a basis for the jury to give meaningful consideration and effect to Pierce's mitigating evidence of youth and good behavior in prison but did not provide such a basis for the remainder of Pierce's mitigating evidence. The prosecutor's closing comments may have exacerbated this problem by impressing upon the jury that its deliberations should be guided by the special issues alone. The prosecutor's comments at voir dire may have also undermined the jury's ability to give meaningful consideration and effect under the special issues to the evidence of

22

No. 08-70042

Pierce's youth. Accordingly, we affirm the district court's order of resentencing. Because we affirm on this basis, we do not consider whether Pierce's claim of ineffective assistance of counsel at sentencing provides an alternative basis for resentencing. *Accord Beckham v. Wainwright*, 639 F.2d 262, 265 n.4 (5th Cir. 1981) (declining to consider whether the alleged denials of the right to confrontation and right to jury trial provided bases for habeas relief and a new trial because the petitioner's ineffective assistance claim provided such a basis).

## IV.  THE *ATKINS* CLAIM

We granted a COA on the issue of whether Pierce is ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304, in which the Supreme Court held that the Eighth Amendment forbids the execution of mentally retarded persons. The *Atkins* Court "le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id.* at 317 (alterations and internal quotation marks omitted). In Texas, a finding of mental retardation requires:  (1) significantly sub-average intellectual functioning (generally, an IQ of 70 or below); (2) deficits in adaptive functioning; and (3) onset before age 18. *See Ex parte Briseno*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004). Pierce bore the burden of establishing by a preponderance of the evidence that he is mentally retarded. *Id.* at 7–8, 12; *Woods v. Quarterman*, 493 F.3d 580, 585 & n.3 (5th Cir. 2003). Pierce contends that the district court erred in concluding that the state habeas court was not unreasonable in determining that Pierce does not meet the Texas definition of a mentally retarded person.

### A.    Background

We briefly summarize the evidence that the state habeas court considered as to Pierce's *Atkins* claim in order to provide a background for our analysis of Pierce's contentions. Dr. George Denkowski submitted an affidavit for the State. Dr. Denkowski reviewed documents and examined Pierce in prison, administering, among other tests, the Stanford–Binet Intelligence Scales—Fifth

23

Edition (SB-5) and the Adaptive Behavior Assessment System (ABAS).  Pierce attained a full-scale IQ score of 80 on Dr. Denkowski's administration of the SB-5.  Dr. Denkowski opined that Pierce's IQ might actually be slightly higher than this score suggested because Pierce suffered from moderate anxiety and mild depression, which may have suppressed the score.  Pierce's ABAS results showed a significant adaptive deficit only in functional academics.

Three expert witnesses submitted affidavits on Pierce's behalf.  The first expert, Dr. June Kaufman, examined and evaluated Pierce in connection with his original state habeas application in 1990.  Dr. Kaufman's affidavit did not include an IQ score for Pierce, but did opine that he was "functionally mentally retarded" and displayed adaptive deficits in the form of "understand[ing] society's basic value systems and conventions," which resulted in "extremely poor social judgment in everyday life situations."  The second expert, Dr. Richard Garnett, did not examine Pierce but did review his records.  Dr. Garnett noted that Pierce had attained IQ scores ranging from 67 to 81 on various tests administered during his childhood and young adulthood and observed that Pierce appeared to perform best in structured settings, a trait common among the mentally retarded.  The third expert, Dr. Rosin, administered the Wechsler Adult Intelligence Scale III, on which Pierce attained an IQ score of 70.  Dr. Denkowski's affidavit questioned that score, arguing that the result was unreliable because Dr. Rosin had administered only a short form of that test.  Dr. Rosin also completed the Vineland Adaptive Behavior Scales using information from Pierce's records, reports from the Assistant Warden on death row, and information provided by Pierce.  Dr. Rosin's Vineland results showed a significant adaptive deficit only in communication.

The State habeas trial court considered these affidavits and adopted the proposed findings of fact and conclusions of law submitted by the State.  These included that the contents of Dr. Denkowski's affidavit—including his various

criticisms of Pierce's experts' affidavit testimony—were credible.  These also included that because Dr. Garnett was not certified by the Texas Department of Mental Health and Mental Retardation to make a diagnosis of mental retardation but was instead a licensed marriage and family counselor, he was not qualified to make a diagnosis of mental retardation under Texas law.  The TCCA rejected the state habeas trial court's finding as to Dr. Garnett's qualification to diagnose mental retardation, but otherwise adopted the state habeas trial court's findings of fact and conclusions of law.

In support of his claim for federal habeas relief, Pierce sought an evidentiary hearing in the federal district court as to whether he is mentally retarded.  Pierce urged in the district court, and continues to urge in this court, that a hearing is warranted because there is "new evidence" that Dr. Denkowski was discredited by the TCCA in another death penalty case after making several methodological errors.  *See Ex parte Plata*, No. AP-75820, 2008 WL 151296 (Tex. Crim. App. Jan. 16, 2008) (per curiam).  Pierce contends that Dr. Denkowski committed some of those same errors in the present case and also points to additional purported shortcomings in Dr. Denkowski's analysis that did not occur in *Plata*.  Pierce also asserts, for the first time on appeal, that the state habeas trial court erroneously found that Dr. Garnett was not qualified to diagnose mental retardation, and that although the TCCA declined to adopt this finding, other of the findings that the TCCA did adopt were premised upon this finding.

The district court declined to hold an evidentiary hearing on the putative new evidence and concluded that all of the errors that Dr. Denkowski purportedly committed in *Plata* either were not committed in Pierce's case or would not have affected the state habeas court's conclusions.  *Pierce*, 2008 WL 4445064, at **13–15.  Pierce asks this court to conclude that the district court abused its discretion in refusing to hold an evidentiary hearing.  In the

alternative, Pierce asks, for the first time on appeal, that this court stay the case and hold it in abeyance while the state habeas court (to which he proposes to repair) considers the "new evidence" as to Dr. Denkowski's performance in *Plata*.

## B.   *Atkins* Issues Raised in the COA Application

Pierce's COA application raised the following five specific issues as bases for relief under *Atkins*:

1.   As in *Plata*, Dr. Denkowski improperly contended that depression and anxiety had a suppressive effect on Pierce's IQ score;

2.   As in *Plata*, Dr. Denkowski improperly evaluated Pierce's adaptive deficits and overstated the impact of sociocultural factors on these deficits;

3.   Dr. Denkowski improperly criticized the results of IQ tests administered to Pierce by other experts as being less reliable because only certain subparts were administered;

4.   Dr. Denkowski failed to inform the court of the "Flynn Effect," which might have artificially inflated Pierce's IQ score on tests administered by other experts in 1975 and 1976.  Dr. Denkowski also failed to inform the court that these same tests may be structured so as to overrepresent IQ; and

5.   The state habeas trial court made a clearly erroneous finding of fact that one of Pierce's experts, Dr. Garnett, was not qualified to diagnose mental retardation.  Although the TCCA declined to adopt this finding of fact, the state habeas trial court's other findings of fact as to Dr. Garnett, which the TCCA did adopt, improperly relied on this erroneous finding.

In granting a COA, we directed Pierce to "provide a record citation to where each such issue was raised before the state habeas court and federal district court—or, if the issue was not raised in these forums, to explain why the issue could not have been raised there."

## C.   Analysis

For the first two issues on which we granted a COA, Pierce contends that, as in *Plata*, Dr. Denkowski improperly testified that depression and anxiety had

a depressive effect on Pierce's IQ score and improperly evaluated Pierce's adaptive deficits, overstating the impact of sociocultural factors on these deficits. But the district court addressed both of these arguments. As to Pierce's IQ score, the district court observed that in Pierce's case, unlike in *Plata*, "Dr. Denkowski did not have to rely on claims of clinical judgment to achieve an IQ score that is above the mentally retarded range." *Pierce*, 2008 WL 4445064, at *13. Pierce attained a full-scale IQ of 80 on Dr. Denkowski's administration of the SB-5 before making any adjustments for depression or anxiety. *Id*. As to Pierce's adaptive deficits, the district court held that even if Dr. Denkowski's evidence were not considered, "the evidence supports a finding that Pierce does not have significant deficits in adaptive behavior." *Id*. at *15. Pierce's COA application and supplemental briefing do not actually challenge the district court's conclusions as to these issues. These issues, therefore, do not provide a basis for *Atkins* relief.[10] *See Ortiz v. Quarterman*, 504 F.3d 492, 501 n.6 (5th Cir. 2007); *Hughes v. Johnson*, 191 F.3d 607, 613 (5th Cir. 1999).

As to the third and fourth issues on which we granted a COA—that Dr. Denkowski improperly criticized the reliability of Pierce's short form IQ test scores and failed to explain how the "Flynn Effect" and structural test flaws would have inflated the results of tests that other specialists administered to Pierce—Pierce concedes that he never raised these issues before the district court. Pierce contends that he did not do so because his strategy before the district court was to argue "that Denkowski's credibility had been globally undermined by *Plata* and that an evidentiary hearing was required to determine

---

[10] In any event, to the extent that Dr. Denkowski might have committed these errors in Pierce's case, the fact of these errors would not be "new evidence" in light of *Plata* because these errors were factual in nature and could have been identified by Pierce's experts before *Plata* was published. Pierce submitted the affidavit testimony of three expert witnesses on mental retardation in connection with his state habeas application and federal habeas petition. None of these affidavits cited any errors in Dr. Denkowski's affidavit.

precisely how Denkowski applied similarly flawed methodologies in this case." Pierce argues that the "gist" of his argument in the district court was that Dr. Denkowski's entire opinion was infected with errors, and that he raised these discrete issues on appeal simply to highlight examples: "These arguments were intended to highlight significant flaws in Denkowski's methodologies . . . and to show that it is simply not possible to carve out the flawed portions of Denkowski's report and then make a determination that what remains is scientifically sound and supports the state court's decision."

Pierce's argument is not persuasive and does not provide a basis for granting habeas relief or an evidentiary hearing. First, Pierce admits that he did not raise these contentions in the district court. "'[W]e have repeatedly held that a contention not raised by a habeas petitioner in the district court cannot be considered for the first time on appeal from that court's denial of habeas relief.'" *Goodrum v. Quarterman*, 547 F.3d 249, 259 n.49 (5th Cir. 2008) (quoting *Johnson v. Puckett*, 930 F.2d 445, 448 (5th Cir. 1991)). Second, contrary to Pierce's assertions about his "global" strategy in the district court, Pierce *did* in fact argue in the district court that Dr. Denkowski's affidavit contained a number of specific errors—but those alleged errors were different than those that he now urges on appeal. Third, none of Pierce's *own* experts raised the Flynn Effect or structural test flaws as reasons for concluding that Pierce's IQ was lower than his scores on IQ tests not administered by Dr. Denkowski might indicate. Finally, neither the accuracy of short-form test scores, nor the Flynn Effect, nor alleged structural test flaws were at issue in *Plata*. In short, Pierce's argument that Dr. Denkowski's work in *Plata* provides "new evidence" that Dr. Denkowski performed deficiently has no merit and does not provide a basis for habeas relief or an evidentiary hearing.[11] Because Pierce's contentions as to

---

[11] Pierce seems to suggest that errors in an expert witness's work in another case, without a showing that those errors occurred in or may have affected the outcome of the

No. 08-70042

"new evidence" lack merit, we also deny Pierce's request, raised for the first time on appeal, to stay the case and hold it in abeyance while the state habeas court considers the "new evidence" as to Dr. Denkowski's performance in *Plata*.

As to the fifth issue on which we granted a COA—whether the state habeas court's finding that Dr. Garnett was not qualified to diagnose mental retardation, which the TCCA rejected, improperly affected other findings of fact about Dr. Garnett that the TCCA adopted—Pierce again admits that he did not raise this issue before the district court. It therefore does not provide a basis for relief. *See Goodrum*, 547 F.3d at 259 n.49; *Puckett*, 930 F.2d at 448. In any event, the TCCA's order reveals no evidence of any such taint. The TCCA adopted the following factual findings: Dr. Garnett did not examine Pierce but merely reviewed his records; Dr. Garnett is not licensed as a psychologist in the state of Texas but instead is a licensed marriage and family counselor; in other cases, Dr. Garnett has been found to be biased or inexperienced; and based on other evidence in the record as to Pierce's mental faculties, Dr. Garnett's diagnosis of mental retardation was "unpersuasive." None of these findings relies on the trial court's erroneous finding, rejected by the TCCA, that Dr. Garnett was unqualified to diagnose an individual as mentally retarded. There is no basis in the record to conclude that the TCCA's findings were in any way dependent on the finding of fact that the TCCA rejected.

None of the issues raised in Pierce's habeas application provides a basis for habeas relief or an evidentiary hearing. Accordingly, we affirm the district court's denial of *Atkins* relief.

---

petitioner's case, can provide a proper basis for habeas relief or an evidentiary hearing. Pierce cites no authority for this proposition, and we have located none. In evaluating Pierce's application for habeas relief, the district court's task was to determine whether the state habeas court's determination of the facts was reasonable and whether the "new evidence" of Dr. Denkowski's performance in *Plata* called that determination into question. The district court concluded that the errors in *Plata* that Pierce contended Dr. Denkowski also made in his own case either did not occur or would not have affected the result.

No. 08-70042

## D.    The Dissent's Argument for an Evidentiary Hearing

The dissent argues that Pierce is entitled to an evidentiary hearing in the federal district court on his *Atkins* claim because the state habeas court did not hold a live evidentiary hearing to determine whether Pierce was mentally retarded.  The dissent urges this court to conclude that, as a matter of clearly-established Supreme Court law, a live evidentiary hearing is "guaranteed to a prisoner who has made a plausible showing of mental retardation."

The most critical obstacle to the relief the dissent proposes is that Pierce never, in either his pleadings or voluminous briefing, cited the lack of a live evidentiary hearing in the state habeas court as a basis for obtaining an evidentiary hearing in the federal district court.[12]  Throughout his federal habeas proceedings, Pierce's request for an evidentiary hearing has been premised solely on the propositions—which this entire panel has rejected—that *Plata* provided "new evidence" that Dr. Denkowski's affidavit testimony to the state habeas court was unreliable and that the TCCA may have adopted erroneous findings of fact regarding Dr. Garnett.  Under our precedents, because Pierce did not raise the lack of an evidentiary hearing in the state court as a basis for relief in the district court or even in his pleadings and briefing to this court, we cannot consider it here.  *See Goodrum*, 547 F.3d at 259 n.49; *Puckett*, 930 F.2d at 448.

## V.  CONCLUSION

We AFFIRM the district court's grant of habeas relief based on the *Penry* violations at Pierce's sentencing, and accordingly AFFIRM the district court's resentencing order.  Because we affirm resentencing on this basis, we do not

---

[12] Pierce did not make an effort to develop this argument even when the dissent to our denial of a COA specifically invited him to do so—rather, in his supplemental briefing, Pierce stated only that he "would add the concerns discussed by Justice Dennis in his concurring and dissenting opinion in this case as additional reasons why a hearing is required in this case."

No. 08-70042

address whether Pierce's ineffective assistance of counsel claim provides an additional basis for resentencing.  We AFFIRM the district court's denial of habeas relief and an evidentiary hearing on Pierce's *Atkins* claim.

AFFIRMED.

No. 08-70042

DENNIS, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from the majority's reasons and conclusion in rejecting Pierce's *Atkins* claim, because the procedure the Texas courts used to determine whether Pierce is mentally retarded did not comply with the requirements of constitutional due process. In all other respects consistent with this view, I concur in the majority opinion.

I.

Pierce was found not to be mentally retarded by a state habeas court judge on the basis of an affidavit by the state's expert, without a live adversarial evidentiary hearing, without an opportunity to testify or call witnesses, and without an opportunity to confront and cross-examine the witness against him. In the state habeas proceedings, Pierce presented the affidavits of three mental retardation experts, Dr. June Kaufman, Dr. Richard Garnett, and Dr. Susana Rosin, who each set forth his or her findings, evaluation and opinion that Pierce is mentally retarded.[1] The state presented the affidavit of its expert, Dr. George

---

[1] Dr. Kaufman, a clinical psychologist, evaluated Pierce in 1990. She administered the Wechsler Adult Intelligence Scale-Revised, the result of which she considered "without question valid." Dr. Kaufman also noted that Pierce exhibited classic traits of the mentally retarded and pointed to Pierce's adaptive behavioral issues, observing that he did not think through the consequences of his actions, had gross deficiencies comprehending society's basic value systems and conventions and exhibited extremely poor social judgment in everyday life situations. Against this background and his earlier IQ scores of 74 in 1972 and 1974 and 67 in 1975, Dr. Kaufman concluded that Pierce was mentally retarded at the time of the crime in 1977.

Dr. Garnett submitted an affidavit in support of Pierce's successive state habeas petition in 2002. Dr. Garnett also opined that Pierce was mentally retarded. He noted that Pierce scored below 75 on seven IQ tests over a period of several years, and that a test score of 81 on the Wechsler Adult Intelligence Scale in 1976 was an outlier and may have had to do with hints from the administrator or the test-retest factor. Further, Dr. Garnett also noted that Pierce had significant adaptive deficits. He pointed out that it was common for a mentally retarded person to respond well to structured settings, such as a prison, as is the case with Pierce, only to revert back to unacceptable or illegal behavior as soon as he is outside of that environment.

Dr. Rosin, a clinical psychologist, evaluated Pierce in support of his state habeas application in 2002. She noted that Pierce's school records showed a consistent pattern of underachievement and observed that Pierce obtained full scale IQ scores of 69 at age nine and 74 at age twelve, both on the Otis-Lennon Test of Mental Ability, and two scores of 67 and 75 on tests administered in 1975. Dr. Rosin administered the Wechsler Adult Intelligence

Denkowski, which set forth his evaluation and opinion that Pierce is not mentally retarded. Dr. Denkowski's affidavit also contained his reasons for discounting or disagreeing with the contrary opinions of Pierce's experts.[2] Pierce requested a contradictory evidentiary hearing. But the state habeas court denied Pierce's motion and did not seek any further input from Pierce's experts. Rather, the state court found that Dr. Denkowski presented a "credible affidavit" and, on the basis of that affidavit, decided that Pierce is not mentally retarded.[3] Accordingly, the state habeas trial court held that Pierce is not exempt from the

---

Scale-III, on which Pierce scored an IQ of 70. Dr. Rosin further noted that Pierce had significant deficits in conceptual, social and practical skills, pointing to his long history of problems socializing with others, exercising sound judgment, resisting peer pressure, and learning from past experiences. According to Dr. Rosin, his IQ score and his adaptive deficits placed him in the mildly mentally retarded range.

[2] Dr. Denkowski reviewed Pierce's files and evaluated him on death row. He administered the Stanford-Binet Intelligence Scales-Fifth Edition, on which he said Pierce achieved a score of 80. Dr. Denkowski opined that, adjusted for moderate anxiety and mild depression, his score was actually in the 80 to 84 range. Further, Dr. Denkowski opined that, apart from his low academic skills, Pierce did not have significant deficits in adaptive functioning. Dr. Denkowski's affidavit otherwise focused on criticizing the opinions of Pierce's three experts–shielded from any form of response or cross examination.

[3] The state habeas court completely ignored that the expert witnesses examined Pierce at wide intervals (in one instance over a decade apart) and under differing circumstances, with some having analyzed Pierce and made findings prior to the Supreme Court's decision in *Atkins*; a wide variety of tests were administered involving varying parameters and substantial nuance and complexity; and the mental health experts sharply disagreed on whether Pierce is mentally retarded and submitted diametrically opposed affidavits. Additionally, the qualifications and integrity of Dr. Denkowski, whose affidavit was the pivotal and exclusive basis for the state trial habeas court's finding that Pierce was not mentally retarded, are now under close scrutiny and his methods have been recognized to be unreliable by this court, the Texas state courts, and the state licensing authorities. *See Hall v. Quarterman*, 534 F.3d 365, 371 n.27 (5th Cir. 2008); *id.* at 376 (Higginbotham, J., concurring in part and dissenting in part); *Ex parte Plata*, No. 693143-B (351st Dist. Ct. Sept. 28, 2007), *aff'd*, No. AP-75820, 2008 WL 151296 (Tex. Crim. App. Jan. 16, 2008); *Tex. State Bd. of Examiners of Psychologists v. Denkowski*, 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 (Tex. State Office of Admin. Hrgs); Renee Feltz, *Cracked*, Texas Observer, Jan. 5, 2010, available at http://www.texasobserver.org/cover-story/cracked (*last visited* April 11, 2010).

death penalty. On appeal, the TCCA adopted the state habeas trial court's findings and conclusions.[4]

The federal district habeas court refused to grant Pierce an evidentiary hearing on his *Atkins* claim, found that the state courts' rejection of his *Atkins* claim was not unreasonable under AEDPA, and therefore rejected his petition for federal habeas relief. *Pierce v. Quarterman*, No. H-07-1561, 2008 WL 4445064, at **13-15 (S.D. Tex. Sept. 26, 2008). In doing so, the district court failed to enforce Pierce's clearly established constitutional right to procedural due process.

## II.

Construing and applying the Eighth Amendment in the light of our "evolving standards of decency," the Supreme Court in *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), held that the Constitution "'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Id.* (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)). In *Schriro v. Smith*, the Court observed that *Atkins* stated in clear terms that "'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences,'" 546 U.S. 6, 7 (2005) (alterations in original) (quoting *Atkins*, 536 U.S. at 317), but also stated that "those measures might, in their application, be subject to constitutional challenge," *id.* Thus, under *Atkins* a person has a substantive right not to be executed if he is mentally retarded, and once he makes a prima facie showing that he is mentally retarded,

---

[4] The only state habeas trial court finding not adopted by the TCCA was its clearly erroneous exclusion of Dr. Garnett's affidavit on the basis that he was not licensed in Texas and thus ineligible to opine on mental retardation in civil commitments under the Persons with Mental Retardation Act, Tex. Health & Safety Code § 591.003(16).

he is entitled to an adjudication meeting constitutional standards to determine his condition.[5]

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Id.* (citing *Vitek v. Jones*, 445 U.S. 480, 493-494 (1980) (liberty interest in avoiding involuntary psychiatric treatment and transfer to mental institution) & *Wolff v. McDonnell*, 418 U.S. 539, 556-558 (1974) (liberty interest in avoiding withdrawal of state-created system of good-time credits)).

In *Vitek*, the Court held that, "[b]ecause prisoners facing involuntary transfer to a mental hospital are threatened with immediate deprivation of liberty interests and because of the inherent risk of a mistaken transfer," due process requires procedures similar to those required in parole revocation proceedings. *Id.* at 495-96 (citing *Morrissey v. Brewer*, 408 U.S. 471 (1972)). According to *Vitek*, the minimum procedures before transferring a prisoner to a mental hospital include the following: (1) "Written notice to the prisoner that a transfer to a mental hospital is being considered"; (2) "A hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure to the prisoner is made of the evidence being relied upon for the transfer and at which an opportunity to be heard in person and to present documentary evidence is given"; (3) "An opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state"; (4)

---

[5] *See Panetti v. Quarterman*, 551 U.S. 930, 934-35 (2007) ("Under *Ford*, once a prisoner makes the requisite preliminary showing that his current mental state would bar his execution, the Eighth Amendment, applicable to the States under the Due Process Clause of the Fourteenth Amendment, entitles him to an adjudication to determine his condition.").

"An independent decisionmaker"; (5) "A written statement by the factfinder as to the evidence relied on and the reasons for transferring the inmate"; (6) "[In some instances] [a]vailability of legal counsel, furnished by the state, if the inmate is financially unable to furnish his own"; and (7) "Effective and timely notice of all the foregoing rights." *Id.* at 494-95; *see also Morrissey*, 408 U.S. at 489 (listing elements of due process for parole revocations). If these elements of due process are constitutionally required before a state may revoke a former prisoner's parole (*Morrissey*) or involuntarily hospitalize and treat a prisoner for mental illness (*Vitek*), certainly they are guaranteed to a prisoner who has made a plausible showing of mental retardation before he may be declared mentally fit and eligible for execution.

The Court's decisions, especially *Vitek, Morrissey*, and *Wolff*, clearly indicate that Pierce, who made a prima facie showing that he is mentally retarded, is entitled to have his condition adjudicated in a contradictory evidentiary hearing in which he has an opportunity to present testimony of witnesses and to confront and cross-examine witnesses called by the state. The state courts plainly failed to provide Pierce with these constitutional procedures required by due process. Because Pierce's liberty interest at issue here arises directly from the Constitution itself, and not from an expectation or interest created by state laws or policies, his case invokes the full due process protections established by *Vitek* and *Morrissey* and does not call for the additional step of applying the framework established in *Mathews v. Eldridge*, 424 U.S. 319 (1976).[6] Moreover, application of *Mathews* here serves only to confirm that all of the due process essentials set forth in *Morrissey* are required in this case. The

---

[6] Under the *Mathews* balancing test, we weigh "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

private interest that will be affected by the official action here, Pierce's life, is, of course, maximal. The risk of an erroneous deprivation of such an interest through lesser procedures than those established by *Morrissey* is intolerably great, and the value of requiring additional procedural safeguards is extraordinarily high.  Consequently, the government's interest in avoiding the cost of additional process, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail, is relatively small and does not outweigh the other considerations involved or justify a lesser level of process.[7]

Under AEDPA, a federal court may grant habeas relief only if the state court's adjudication of the claim on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in 28 U.S.C. § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires." *Panetti*, 551 U.S. at 953-54 (citing *Wiggins v. Smith*, 539 U.S. 510, 527-29, 534 (2003)).  "Here, due to the

---

[7] It bears emphasis, moreover, that Pierce is one of the few Texas death row inmates who has not been afforded such a full due process hearing in a post-*Atkins* case.  Starting with *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004), in which the Texas Court of Criminal Appeals implemented the Supreme Court's pronouncements in *Atkins*, the prisoner was granted a live hearing on remand in state trial court to determine whether he was mentally retarded.  As Judge Higginbotham observed, "Texas courts quickly found their footing post-*Atkins*. . . .  Briseno was also convicted before *Atkins* but . . . received a five-day evidentiary hearing on his post-*Atkins* habeas claim of mental retardation." *Hall*, 534 F.3d at 389 (Higginbotham, J., concurring in part and dissenting in part) (citing *Briseno*, 135 S.W.3d at 4).  Such live hearings have become the norm in *Atkins* cases in the Texas state courts. *See* Sarah Gail Tuthill, Comment, *The Texas-Size Struggle to Implement* Atkins v. Virginia, 14 Tex. Wesleyan L. Rev. 145, 146-47, 166 (2007) (describing the "county-by-county patchwork quilt" of procedural approaches).

state court's unreasonable application of [*Atkins*, *Vitek*, *Morrissey*, and *Wolff*,] the factfinding procedures upon which the court relied were 'not adequate for reaching reasonably correct results' or, at a minimum, resulted in a process that appeared to be "'seriously inadequate for the ascertainment of the truth.'" *Id.* at 954 (quoting *Ford*, 477 U.S. at 423-424 (Powell, J., concurring in part and concurring in judgment)).

### III.

For these reasons, in my view, the judgment of the federal district court deferring to the state courts' rulings on Pierce's mental condition should be vacated and the case should be remanded in part to the district court with directions to consider Pierce's *Atkins* claim on the merits in an adversarial evidentiary hearing in accordance with the foregoing due process principles and without deferring to the state courts' findings.